For the reasons mentioned, the judgment of the trial court will be reversed and the cause remanded.

---

**BOYD et al. v. MOTL et al. (No. 6447.)***

(Court of Civil Appeals of Texas. Austin. Dec. 7, 1921. Rehearing Denied Jan. 11, 1922.)

**I. Waters and water courses ⚌127—Exclusive right may be acquired by prescription and limitation.**

An exclusive right to the use of water may be acquired by prescription and limitation, provided such right has been exercised for the length of time and under the circumstances required by law.

**2. Waters and water courses ⚌138—Rights of riparian owners not barred by prescription, where they had never desired to use the water.**

Where defendants, as owners of riparian lands, made no attempt to irrigate the lands until the spring of 1921, and their use of the water for domestic and stock purposes had never been impared or infringed upon by plaintiffs' diversion of the water of a stream, and plaintiffs had never put them upon notice that they claimed the use of all the water above a dam to the exclusion of defendants, plaintiffs had no right by prescription or under the statutes of limitation, especially where plaintiffs' ditch was so constructed that they could take only the upper 12 inches of the water impounded by the dam, leaving over 6 feet of water, more than enough to irrigate defend-

ants' land, serving no useful purpose except to serve as a foundation for the upper 12 inches.

**3. Waters and water courses ⬤137—No title acquired by limitation under filing of papers with water board where three years had not elapsed.**

Under Vernon's Ann. Civ. St. Supp. 1918, art. 5011cc, providing that when an appropriator of water shall have filed an appropriation in accordance with the laws in force at the time of the filing, and filed with the board of water engineers a certified record of the appropriation as required by Acts 33d Leg. (1913) c. 171 (Vernon's Sayles' Ann. Civ. St. 1914, art. 4991 et seq.), and shall have made use of the waters under the terms of such filing for three years after that act takes effect, he shall have a title to such appropriation by limitation, had no application where three years had not elapsed since the filing with the board of the certified record of the appropriation.

**4. Waters and water courses ⬤133—Appropriation which will support limitation under statute must be under valid statute.**

Under Vernon's Ann. Civ. St. Supp. 1918, art. 5011cc, providing that any appropriator of water filing an appropriation in accordance with the laws in force at the time, and filing with the board of water engineers a certified record of the appropriation, and making use of the water thereunder for three years, shall have title by limitation, the appropriation must have been filed under a valid existing law, and not under a law which has been declared unconstitutional in so far as it attempted to take away riparian rights without condemnation or compensation.

**5. Eminent domain ⬤2(10)—Appropriator of water cannot obtain exclusive rights under statute divesting riparian rights without condemnation or compensation, and without regard to public or private nature of use.**

Plaintiffs could not legally claim any exclusive right to the water of a stream by appropriation thereof in compliance with any statute undertaking to divest the rights of riparian owners without condemning their lands or paying compensation, though the stream was a navigable stream, and though the Legislature by a series of acts has declared the waters of such streams to belong to the public or to be the property of the state, in the absence of any statute reserving or divesting riparian rights prior to the grants or patents from the state, and without regard to whether such attempted divestiture of riparian rights was for a public or private use.

**6. Constitutional law ⬤80(2) — Order of board of water engineers, denying permit to take water, held null as an exercise of judicial power.**

Where, on defendants' application to the board of water engineers for a permit to take water from a stream for irrigation, protests were filed by other parties claiming prior rights, and the board entered on a hearing of the facts and law, and considered the certified filings, protests, and affidavits filed in support thereof, and made their order upon both the facts and the law, the order, so far as it would deny defendants a recourse to the courts for the adjudication of their riparian rights, was a nullity, because the board was exercising judicial power which the Legislature was without power to authorize it to exercise.

Appeal from District Court, Tom Green County; C. E. Dubois, Judge.

Suit by Charles C. Motl and others against R. W. Boyd and others. From an order overruling a motion to dissolve a temporary injunction, defendants appeal. Reversed and remanded, with instructions.

Blanks, Collins & Jackson, of San Angelo, for appellants.

Hill & Hill, of San Angelo, for appellees.

BRADY, J. This is an appeal from an order overruling a motion by appellants to dissolve a temporary injunction, which had theretofore been granted upon the petition of appellees, on an ex parte hearing. The motion was heard upon the pleadings and evidence. The issues made by the pleadings are set out in a statement in appellants' brief, which is conceded to be substantially correct, with the exceptions hereinafter noted. Therefore we copy such statement here:

"The pleadings of the plaintiffs in substance set up that about the year 1888 one John R. Nasworthy was the owner of the land now known as 'Twin Mountain farm,' and agreed with Wm. Lackey, if the said Lackey would put the irrigable land in cultivation and under irrigation by means of a dam and ditch from Spring creek, the said Nasworthy would convey him the land, and that they went to P. C. Lee, who was then the owner of the defendants' lands located some four miles up the creek from said Twin Mountain farm, and asked Lee for permission to construct the dam across the creek and abutting on one of the surveys now owned by defendants, and permission to construct a ditch leading out from said dam through the lands of the said Lee to said Twin Mountain farm, and that the said Lee consented to such arrangement, and thereupon the said Lackey constructed an earthen and brush dam and a ditch to divert water from the reservoir made by said dam, and in 1888 or 1889 began the irrigation of something like 650 acres of said land.

"That on October 15, 1888, the said Lackey conveyed said Twin Mountain farm to J. S. Fowlkes, who prior to November 21, 1889, completed the construction of the dam and ditch, and that on said date the said Fowlkes, being then the owner and in possession of said land and utilizing said dam and ditch for irrigation purposes, in compliance with the provisions of chapter 88 of the General Laws of Texas, passed by the Twenty-First Legislature and approved March 19, 1889, filed his affidavit and map of said Twin Mountain farm, dam, and ditch, as required by said act, with the county clerk of Tom Green county, which said map and affidavit was recorded in the Irriga-

⬤For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

tion Ditch Records of said county, and was correct except that such affidavit stated that the headgate of said ditch was situated on survey No. 656, when as a matter of fact it was situated on survey No. 655 in the name of German Emigration Company.

"That thereafter on November 13, 1899, Fowlkes conveyed the land and his irrigation rights to the father of the plaintiffs, using the following language in his deed with reference to the dam and ditch: 'Also the dam and irrigating ditch which supplies said lands with water for irrigating the same, known as the Twin Mountain farm dam and ditch and all water rights and privileges secured by said dam and ditch, except, however, the right of W. M. Johnson to irrigate his farm, being six hours of water every eight days, to which said Johnson is entitled, and except said right of said Johnson hereby reserved, the entire right to said dam and ditch and the water supply of same is hereby conveyed to said Motl.'

"And that thereafter, the plaintiffs, as the owners of said farm, on the 18th day of December, 1920, in compliance with the Irrigation Acts of 1913 and 1917, made and filed the affidavit and map required by said acts, such filing having been made in the office of the county clerk of Tom Green county on December 20th, 1920, and duly recorded by him in the Deed Records of Tom Green County, Texas, and that thereafter, the plaintiffs filed a certified copy of the map and affidavit with the board of water engineers at Austin, Tex.

"Plaintiffs allege that during the year 1904 or 1905 their ancestor, at his own cost and expense, replaced the original earthen and brush dam constructed by Lackey with a concrete dam at an actual outlay and cost to him of some $1,500, and that the surface area covered by the reservoir formed by said concrete dam is approximately 105 acres, and has a holding capacity of 750–acre feet, and that the ditch used by plaintiffs for purpose of irrigating said Twin Mountain farm emanating from said dam is so constructed that it will take out of said creek and reservoir above the same the water accumulated therein down to a point 8 to 12 inches below the top of said dam, but that on account of rock and gravel obstructions immediately in front of said ditch, after the water is lowered to a point below 12 inches from the top of said dam, no water will run down said ditch.

"Plaintiffs allege that they and their predecessors in title had been continuously and notoriously using the water out of said creek and reservoir by means of said dam and ditch for the purpose of irrigating their lands for more than 30 years preceding the filing of their petition, and that their use and appropriation of the water had been adverse and uninterrupted.

"They allege that they had growing on said Twin Mountain farm between 40 and 50 acres of corn, about 150 acres of cotton, and about 200 acres of hay, maize, garden and feed stuff, and that irrigation was necessary for the proper cultivation of said crops.

"Plaintiffs allege in their petition, by reason of the facts above stated, a right to the use of the water in said creek and reservoir to the full extent that same would run into their ditch, and an exclusive control or right to all the water backed up by said dam, by prescription and by limitation, and further allege that on an application of the defendants, made to the board of water engineers of the state of Texas in January, 1921, for permission to use water out of said creek and reservoir for irrigation purposes, which said application was resisted by the plaintiffs and other lower riparian owners, the board of water engineers upon a hearing refused the defendants a permit to use any water for irrigation purposes, and that the plaintiffs, in compliance with the Acts of 1913 and 1917 had filed with the board of water engineers at Austin a certified copy of said original affidavit and map made by Fowlkes, and had thereby acquired dominion over said water to the exclusion of defendants.

"Plaintiffs allege that, notwithstanding the refusal of the board of water engineers to grant any permit to the defendants, said defendants nevertheless during the spring of 1921 prepared 80 acres of their land for cultivation and irrigation, and in April, 1921, began to pump water out of said creek and reservoir to irrigate their land, and at the time of filing the petition for injunction had irrigated something like 20 acres, and by reason of pumping the water out of said creek had lowered the level of the water therein to a point where it would not run down the ditch claimed by plaintiffs in sufficient quantities to irrigate plaintiffs' crops.

"In their supplemental petition plaintiffs also allege that defendants are estopped from claiming or using any water for irrigation purposes to the detriment of plaintiffs, because their predecessors in title stood by and saw Motl and his predecessors in title use and divert the water for 30 years, and expend time and labor on the dam and ditch, and never protested nor objected thereto.

"Briefly summarized, the plaintiffs asserted their right to the absolute control and dominion over the water in said creek and reservoir above said dam, to the exclusion of any use of said water for irrigation by the defendants by reason (a) prescription; (b) prior appropriation by filing affidavit and map under the Acts of 1876 and 1889 and 1906; (c) limitation under the General Statutes and by limitation under the three-year limitation provision contained in the act of 1917; (d) estoppel in pais; (e) by reason of the refusal of the board of water engineers of the state of Texas in January, 1921, to issue a permit to the defendants to use water and by reason of the filing with said board by plaintiffs of the certified copy of the Fowlkes affidavit and map in compliance with the Acts of 1913 and 1917.

"Defendants by their answer and motion to dissolve set up that they were the owners in fee simple of their 160 acres of land by consecutive chain of title under a patent to said land issued in 1851, and that they purchased the land in question in September, 1920, for the purpose of putting same in cultivation and under irrigation, it being riparian land; that they had no notice of the exclusive claims of the plaintiffs to the water in said creek and reservoir above said dam; that the attempted adjudication by the board of water engineers of the state of Texas, denying them their fair proportion of water out of said creek for ir-

rigation purposes, and in effect awarding all of said water to the plaintiffs, was an attempt on the part of said board of water engineers, on an ex parte hearing, to exercise a judicial function, and that the orders and decrees of said board of water engineers were nullities, neither binding defendants nor benefiting the plaintiffs.

"They further allege that by reason of the ditch of plaintiffs being so constructed as that it could use only the upper 12 inches of water in said lake, and there still remaining in said creek immediately above the dam approximately 6 more feet of water, which would not run down the ditch, and could not be used by plaintiffs, and after plaintiffs had used all the water they could use, and there thus remaining more than enough water to irrigate their lands, there was manifestly no equity in plaintiffs' petition, in so far as it undertook to have the defendants restrained from the use of water out of said reservoir when it had reached a level of 12 inches or more below the top of the dam.

"The plaintiffs' reply to this assertion was that if the defendants were permitted to pump water out of the creek after it reached a level below 12 inches from the top of the dam, it would take that much more rain or water flowing in from the upper reaches of the stream to again fill up the bed of the creek to a point where water would again begin to run down their ditch.

"Defendants disputed any right by prescription or estoppel in the plaintiffs, for the reason that at all times preceding the year 1921 the defendants' land had been used only for pasturage purposes, and there had always been plenty of water for domestic and stock water purposes, and that, having no need nor use of any water for purposes of irrigation prior to the year 1921, the diversion of the water opposite their land to the lower riparian lands constituted no use thereof, either adverse or hostile, to the riparian rights appurtenant to the land purchased by them. Upon the same ground they denied that any such exclusive right had accrued to the plaintiffs under the general statutes of limitation.

"They alleged in their answer that neither they, nor their predecesors in title, had never been compensated for their riparian rights, nor had such riparian rights ever been condemned, and therefore that the filing of the various maps and affidavits of appropriation by the plaintiffs and their predecessors in title conferred no rights upon them to the use of the water to the deprivation or exclusion of the riparian rights appurtenant to defendants' land.

"It was developed both in the pleadings of plaintiffs and defendants that Spring creek is a running stream in the semiarid section of Texas, and that the bed of the creek was more than 30 feet wide, and the stream of water in said creek in ordinary flow was less than 30 feet wide, and that the survey lines of the lands bordering on the creek only ran down to the bed of the creek, and did not cross the same.

"It was also developed by the pleadings that at the point opposite defendants' land the reservoir or body of water immediately above the dam was some 8,400 feet long, about 7 feet deep, and that the surface area of the water was about 105 acres.

"Plaintiffs allege that their father paid $15 an acre for the Twin Mountain farm and that without the right to appropriate all the water in said reservoir for the purpose of irrigating same said land would not have been worth at the time he purchased it more than $2 or $3 per acre, and the defendants allege the purchase of their land as raw riparian land in September, 1920, for $40 per acre, which it would have been worth if they were entitled to use their just proportion of water for irrigation purposes, but that if denied same, said land was not worth exceeding $15 per acre at the time they purchased it."

As claimed by appellees, they did not assert any right to all of the waters in Spring creek, but only to that which is contained in the reservoir impounded by their dam. Also the order of the board of water engineers, refusing appellants' application for a permit, qualified the rejection of the application by the language, "Under existing circumstances."

The material facts necessary to an understanding of the issues presented on this appeal may be stated as follows:

"A correct understanding of appellees' position can best be understood by briefly stating the facts under which they base their right to the waters in the reservoir formed by their dam, namely:

"(1) Spring creek is a natural flowing stream having a well-defined channel rising west of the town of Mertzon in Irion county with a bed of an average width from its mouth to practically its head of more than 30 feet, and none of the survey lines of lands bordering thereon cross the same.

"(2) The lands of appellants and appellees are within the arid portions of the state in which, by reason of insufficient rainfall, irrigation is necessary for agricultural purposes.

"(3) In the year 1886, John R. Nasworthy was the owner of the Twin Mountain farm, now owned by appellees, and contracted to convey the same to Wm. Lackey as soon as he should procure irrigation for and place the lands in cultivation. At that time P. C. Lee was the owner of Surveys 655 and 656, now owned by appellants.

"(4) For the purpose of irrigating said Twin Mountain farm, Wm. Lackey, in the spring of 1886, built a wooden and earthen dam across Spring creek, abutting its northern end on that part of survey 655 now owned by appellants, where it has since been and is now located, and constructed a ditch from said dam and the reservoir formed thereby down to and over Twin Mountain farm, and put in cultivation that year about 700 acres of said farm, which he irrigated, and on October 20, 1886, the said Nasworthy, in compliance with his contract, conveyed said farm to said Lackey, by general warranty deed.

"(5) At the time of the construction of said ditch and dam, the said P. C. Lee consented for the said Wm. Lackey and John R. Nasworthy to construct the dam abutting on his land and to build the ditch therefrom.

"(6) Said Lackey continued to take and appropriate said waters by means of said dam and ditch, and to irrigate and cultivate about 700 acres of said farm continuously until October 15, 1888, on which date he sold and conveyed said farm, dam, and ditch to J. S. Fowlkes for $12,500, and the said Fowlkes continued to take and appropriate said waters by means of said dam and ditch, and to irrigate and cultivate said farm continuously until he sold to Charles Motl in 1899.

"(7) In November, 1889, J. S. Fowlkes, in compliance with the act of the Legislature, approved March 19, 1889, entitled 'An act to encourage irrigation,' etc., filed and had recorded in the irrigation ditch records of Tom Green county, vol. 1, pp. 3, 4, the affidavit and map required by said act, a certified copy of which was in December, 1920, filed and recorded by the board of water engineers of Texas, together with the affidavit and information required by the Irrigation Acts of 1913 and 1917

"(8) November 13, 1899, the said Fowlkes, for a consideration of $15,000, sold and conveyed to Charles Motl said farm, with the dam and irrigating ditch and rights.

"(9) In the years 1907 and 1908, Charles Motl rebuilt said original dam with a concrete dam at an actual outlay in money of about $1,500, besides the labor of himself and boys, said dam being built in the same point as the original and is of the approximate height and dimensions as the original.

"(10) Charles Motl from the time of his purchase up to his death in 1917 and appellees since his death have continuously and uninterruptedly diverted and appropriated the waters of Spring creek by means of said dam and ditch, and have used the same in irrigating and cultivating crops on said Twin Mountain farm at all times up to recent years, cultivating and irrigating between 600 and 700 acres of the farm, diverting and appropriating for that purpose all the waters of said Spring creek that their ditch and dam would furnish. In recent years the waters of Spring creek have been so diminished by diversion for irrigation above appellees' reservoir that they have been able to get water sufficient to irrigate and cultivate only between 400 and 500 acres of said farm.

"(11) Appellants purchased their lands on September 13, 1920, and at that time saw and knew that appellees owned said dam across Spring creek, and were diverting the waters from the reservoir formed thereby, to irrigate said Twin Mountain farm.

"(12) November 29, 1920, appellants made application to the board of water engineers for a permit to divert water from said reservoir to irrigate 120 acres of land, and which application was heard on January 17, 1921, and permit refused 'under existing circumstances,' and appellants took no appeal therefrom.

"(13) Appellants, without any permit to divert and appropriate waters from said reservoir to irrigate their lands, nevertheless, thereafter, in the spring of 1921, installed a pump and engine and begun the diversion of the waters in said reservoir, impounded by said dam, whereupon appellees applied to the district court of Tom Green county and secured a temporary injunction, restraining appellants from diverting waters from said reservoir.

"(14) It is admitted by appellants in paragraph 9 of their answer and conceded by appellees in their first supplemental petition that the waters of said Spring creek belong to the state of Texas.

"(15) At the time Charles Motl, in 1899, purchased the Twin Mountain farm, containing 914.85 acres, he bought it as an irrigated farm, paying $15,000 therefor, or $16.40 per acre, when such farms in that vicinity, not irrigated, were selling at about $5 per acre."

Appellees hold their lands by consecutive chain of title from the state of Texas; the surveys having been patented in the years 1858 and 1863. Appellants hold under a consecutive chain of title from the state, the surveys having been patented in the year 1857. At the time appellants acquired title to their 160 acres of land, in September, 1920, none of it was ever before under irrigation, and none had ever been cultivated, except about 20 acres of dry land. At the time Lee, appellants' remote vendor, gave his consent to the erection of the dam and ditch, no consideration was paid to him for such purpose, and none was required by him. Nothing was said at the time about any limitation upon the water rights of Lee, and during the time he owned the land he never objected to the existence of the dam or ditch, or to the use by appellees' vendors of the water stored by the dam, nor did any subsequent owner express objection. No compensation has ever been paid any owner of appellants' land for water rights, nor have same ever been condemned. Prior to the erection of the dam, Spring creek was and now is a running stream at that point; and along and in front of the land owned by appellants there was prior to the construction of the dam a natural hole or reservoir of water in the creek of varying depth; and at all times there has been plenty of water in the creek for domestic and stock purposes, in addition to the water used by appellees and their predecessors in title for irrigation purposes. The 80 acres sought to be irrigated by appellants is planted with various crops, and, if they are denied the right to use the water for irrigation, their crops will probably burn up. While the bed of Spring creek has an average width of more than 30 feet, the water flow therein in ordinary season is less than 30 feet wide.

### Opinion.

The temporary injunction as modified enjoined appellants from pumping or diverting water from the reservoir opposite their farm, formed by a dam constructed by the appellees and their predecessors in title, except that appellants were given the right to pump water from the reservoir for the purposes of irrigating their lands at all such times as the water in the reservoir should be running over the dam.

In support of the judgment of the trial

court, refusing to dissolve the injunction, appellees rely upon several theories. These will be discussed in the order by us deemed most convenient.

[1] We will first consider the claim of appellees that they have acquired the exclusive right and title to the use of the water in controversy, both by prescription and by limitation. It is settled law in this state that such a right may be acquired, provided it has been exercised for the length of time and under the circumstances required by law. Baker v. Brown, 55 Tex. 377; Watkins Land Co. v. Clements, 98 Tex. 578, 86 S. W. 733, 70 L. R. A. 964, 107 Am. St. Rep. 653; Martin v. Burr, 171 S. W. 1044; same case by the Supreme Court, 228 S. W. 543.

[2] Indeed, this is conceded by appellants, but they insist that, being the owners of land riparian to Spring creek, they are entitled to their fair proportion of the water in said creek for the necessary purposes of irrigating their lands, and that neither prescription nor limitation has barred their rights. The specific ground of their claim is that neither appellants nor their predecessors in title ever needed or used any water out of the creek for the purposes of irrigation until the spring of 1921; and that, until such time as the necessity or occasion arose for their use of the water for irrigation purposes, the mere previous use or diversion of the water by appellees was neither hostile nor adverse to the irrigation rights of appellants and their predecessors in title. They contend that time would not begin to run against them, in favor of a prescriptive or limitation title for appellees, until appellants had a cause of action which they could have asserted in court against such claimants.

In support of their contentions, appellants rely strongly upon the case of Martin v. Burr, supra, and cite the well-considered opinion of Mr. Justice Carl for the San Antonio Court of Civil Appeals. The question was fully discussed in that opinion, and numerous authorities were cited. We quote the following pertinent language:

"For all riparian owners have the right to use their just proportion of the water flowing past their lands. And the natural use of such waters takes precedence over such unusual use as irrigation, mills, mining, etc. Every riparian owner has the right to take all the water his needs require as long as such use does not injure his riparian neighbors, in which latter case he may use only his just proportion. No cause of action accrues until the one, by using more than his rightful share of the water, causes or threatens injury to complaining party. Thus, it will be seen, the right to use water is a variable one for, while one man may use the water both for his stock and domestic purposes, as well as for the irrigation of his farm, his neighbor may require it only for stock and domestic uses; or, possibly, he may not need the water at all. He may intend to use his land at some future day for the purpose of establishing an irrigated farm, and yet at present be not using it for any purpose. If he is not using the land, he has no use for the water flowing past, and would not be injured even by his neighbors above him using all of the water, and certainly there would be, in that instance, no injury to him, and it follows that no cause of action exists. As long as appellees had sufficient flowing water for their stock and domestic purposes, they had no cause of action against appellants, because they had not been injured. They were not deprived of any right, and must they be held to presume that they will be denied that which the law says is theirs when they do have occasion to use it?"

The conclusion of the court on this point is well expressed in the language quoted from a Montana case, as follows:

"'No use of water by a subsequent appropriator can be said to be adverse to the right of a prior appropriator, unless such use deprives the prior appropriator of it when he has actual need of it. To take the water when the prior appropriator has no use for it invades no right of his, and cannot even initiate a claim adverse to him.'"

A writ of error was granted by the Supreme Court in Martin v. Burr, and the opinion is reported in 228 S. W. 543. We have carefully read the opinion of Mr. Justice Greenwood, and find nothing therein disapproving of the doctrine announced by the Court of Civil Appeals, but the Supreme Court merely held that, under the facts of the case, it was a question for the jury as to whether or not a prescriptive right or limitation title had been acquired. Indeed, there is language in the opinion of the Supreme Court which apparently sanctions the doctrine under discussion. We quote the following:

"The law authorizes the presumption of a grant from the enjoyment of an incorporeal right which affects the lands of others where such enjoyment has been, for the whole prescriptive period, adverse, peaceable, and continuous, with actual or constructive notice to the persons whose rights are invaded." (Italics ours.)

Again it was said, after stating that there was good reason for the view that the suit was one to quiet title to an incorporeal hereditament:

"The right of defendants in error, or of those under whom they claim, to maintain a suit to quiet their riparian rights, and to prevent wrongful interference therewith, accrued whenever upper riparian proprietors diverted water, for irrigation or for locomotives, to such an extent as to deprive defendants in error or those under whom they claim of water for domestic use, to their substantial injury. Until defendants in error or those under whom they claim suffered substantial injury, no right of action in their favor accrued. The action

became barred four years after the accrual of the right to bring same."

In view of the fact that the case was reversed and remanded for trial, it must be concluded, we think, that the Supreme Court approved the holding of the Court of Civil Appeals on this point; otherwise we should reasonably have expected to find at least some intimation that this rule of law should not be given in charge to the jury. The rule seems to us to be founded in reason and well fortified by authority, and we adopt it in determining this question.

Applying the law to the facts of this case we find from the record that appellants and their predecessors in title had at all times plenty of water for domestic and stock water purposes, and that they had no use or need of the water for irrigation prior to the spring of 1921. No attempt had theretofore been made to irrigate any of such lands. Indeed, none of it was in cultivation, except a small dry land farm of 20 acres. It had been devoted wholly to pasturage purposes, and the diversion of water by appellees had never impaired nor infringed upon the domestic or stock water uses of the appellants or their predecessors in title. It does not appear that appellees or prior owners of their lands ever put appellants or those holding title before them upon notice that they claimed the use of all the water above the dam to the exclusion of the riparian rights appurtenant to appellants' lands. After appellees have used all the water running into their ditch from above the dam, there still remains in the reservoir approximately 630 acre feet of water. This body of water can serve no useful purpose to appellees, except to operate as a foundation for the upper 12 inches of water, which is all that the agreed facts show can be utilized by appellees because of the manner of the construction of their ditch, or obstacles to the flow of the water. Appellants purpose to irrigate only 80 acres, and the 630-acre feet of water above the dam, excluding the upper 12 inches at the top of the dam, is therefore more than seven times enough water to irrigate appellants' lands. Under these facts, we are of the opinion that no cause of action accrued to appellants against appellees which they could have asserted in court until they began to irrigate in the spring of 1921, or at least until they had need for irrigation; and that any prescriptive right or right by limitation did not begin to accrue until such time, because previously appellants or those under whom they claim had suffered no substantial injury.

It follows from what has been said that we conclude that appellees did not establish a title or right by prescription, nor under any of the statutes of limitation invoked by them.

[3] A related question is the claim of appellees that they have acquired the exclusive right of appropriation of the water in the reservoir above the dam as against appellants, in virtue of their compliance with article 5011cc, Vernon's Ann. Civil Statutes, 1918 Supplement. This article reads as follows:

"Whenever any appropriator of water from any stream or other source of water supply located in whole or in part within this state, shall have obtained from the board of water engineers a permit for the use of water, and shall have made use of the water under the terms of such permit; or whenever any such appropriator of water shall have filed an appropriation, in accordance with the laws of this state in force at the time of such filing, and shall have filed with the board of water engineers a certified record of such appropriation, as required by chapter 171 of the acts of the regular session of the Thirty-Third Legislature, and shall have made use of the water, under the terms of such filing or permit for a period of three years after this act shall take effect, he shall be deemed to have acquired a title to such appropriation by limitation, as against any and all other claimants of water from the same stream, or other source of water supply, and as against any and all riparian owners upon said stream or other source of water supply."

It appears from the pleadings of appellees and from the statement of facts that they did not file with the board of water engineers a certified copy of the original appropriation papers and documents until December 20, 1920. The suit was instituted June 1, 1921, and therefore three years had not run prior to the institution of the suit from the filing of the certified record of the appropriation with the board. The statute requires an adverse use of the water, under the terms of the filing with it, or permit granted by it, for a period of three years after the act shall take effect before a title by limitation can be acquired. Under the facts of record, this has not been done, and we conclude that no title under the special three-year statute of limitations was acquired.

[4] My coadjutors further think this statute is inapplicable because the appropriations, a record of which with the board is authorized, are, by the very terms of the article limited to such as were filed "in accordance with the laws of this state in force at the time of such filing." It is their view that this means that no such appropriation can be based upon a law or laws which had been declared unconstitutional by the courts, in so far as it was attempted to take away the riparian rights without condemnation or without offering compensation to the owners. That since the prior act under which appellees had filed their appropriation had been declared void to the extent stated, those laws were not in force at the time of such filing. In other words, it it their opinion that the statute means valid, existing laws, and not laws which for any reason are void.

I confess that the argument is attractive, but to my mind there is as much warrant for believing that the Legislature was here merely prescribing a means of acquiring a limitation title, and that it selected as a standard for the basis of the right the filing of appropriations under previous statutes which were on the books, whether they were valid or not. I know that it is sometimes broadly stated that a law which is void for conflict with the Constitution can have no existence, but I am not sure that this is always so. If the Legislature did, as I am supposing, select the standard of filings under previous statutes, purporting to authorize the appropriations, for the purpose only of founding limitation rights thereon, it is difficult to perceive any valid constitutional objection, and equally difficult to ascribe the very literal meaning to the words employed in expressing that intention. At any rate, I prefer to rest my concurrence on this point on the interpretation of the statute first given.

[5] The next question to be examined is the proposition of appellees that they have acquired the exclusive use of the waters impounded by the dam as against appellants, by virtue of the filing and recording of the affidavit and map by Fowlkes, under the Acts of 1876 (chapter 150), 1889 (chapter 88), 1895 (chapter 21), and perhaps other similar statutes. It is answered by appellants that any act of the Legislature which undertook to provide for the acquisition by one riparian proprietor of the riparian rights of another, without compensation or without condemnation, by simply filing affidavits and maps with any official, are violative of the provisions of the Constitution prohibiting the taking of private property without compensation. It is a conceded fact that no compensation has ever been paid appellants, nor to those under whom they claim; nor have their lands been condemned. This contention is largely based upon the holding and the reasoning in Barrett v. Metcalf, 12 Tex. Civ. App. 247, 33 S. W. 758, a decision by this court.

Before considering the effect of the decision in Barrett v. Metcalf, and of the reasoning of the opinion in that case, we think it important to here call attention to the fact that, whatever may have been the apparent effect of previous holdings, our Supreme Court in Watkins Land Mortg. Co. v. Clements, 98 Tex. 578, 86 S. W. 733, 70 L. R. A. 964, 107 Am. St. Rep. 653, laid down the doctrine that the owners of riparian lands are entitled to their fair proportion of the waters of streams flowing by their lands, for irrigation purposes, in the arid or semiarid portions of the state. Time will not permit any extensive quotation from the clear opinion of Mr. Justice Brown, speaking for the Supreme Court. The following excerpts will suffice to show the effect and trend of the decision:

"Subject to the right of natural use by other riparian proprietors, each riparian owner is entitled to use the water of a stream, which flows by or through his land, for the purposes of irrigation; provided such use is reasonable, considering all of the circumstances and conditions under which it is made."

Again:

"Each riparian owner has equal rights in the stream which flows by him, and the use by each must be reasonable as regards the rights of others."

The opinion proceeds to call attention to the difficulties of determining relative rights, and what is a reasonable use under existing conditions, but states that this constitutes no reason for rejecting the rule of reasonable use as the standard by which to determine conflicting claims.

The case of Barrett v. Metcalf, supra, involved a controversy between two riparian owners in respect to the appropriation of the waters of the South Concho river. Metcalf had constructed an upper dam and ditch, and it was claimed by Barrett that the use of the water therefrom would divert the water of the river so as to deplete the water which would otherwise be stored in a reservoir constructed by Barrett. Barrett claimed a compliance with the Acts of the Legislature of 1889 (chapter 88), and 1893 (chapter 44) by filing his map and affidavit, and that he was a prior proprietor, entitled to have the water come down in his reservoir unobstructed by Metcalf's dam and undiverted by his ditch. In substance, there is no distinction between the facts of that case and the instant case; the defendants in each case claiming under a later appropriation, and prior appropriations being interposed as exclusive. This court denied Barrett's claim to any right of exclusive appropriation by compliance with such statutes, on the ground that, in so far as said laws applied or were sought to be applied to the property rights of Metcalf, they were unconstitutional and void. The gravamen of the holding was that to give such effect to the acts mentioned would be the taking of property without due course of law, there having been no condemnation and no compensation to the owners. The principle of equal rights of riparian owners to a just proportion of such waters for irrigation purposes was recognized and said to be well settled in this state. A writ of error was denied by the Supreme Court in that case, and, as stated by Mr. Justice Brown, in Watkins Land Co. v. Clements, supra, the sole proposition presented to the Supreme Court was that, by virtue of the law under which the corporation was organized, it had the right to appropriate the water of the river to the exclusion of any riparian owner who might claim the use of the water, except through compliance with the terms of the statute.

We conclude that the question must be determined as settled in this state, and that appellees cannot rightfully or legally claim any exclusive rights of appropriation by compliance with any statute which undertakes to divest the riparian rights of appellants, without condemning their lands, or without compensation having been paid.

We think the question just discussed is unaffected by the consideration that Spring creek, under our statute defining navigable streams, may be regarded as such a stream. The statement of facts shows that while the bed of Spring creek is more than 30 feet wide, the ordinary flow of water in the creek is less than 30 feet wide in ordinary season. This court intimated in Bunnell v. Sugg, 135 S. W. 701, the opinion that the test of a navigable stream under the statute was whether its ordinary flow in ordinary season equaled or exceeded 30 feet. But whether this view is correct or not, we think it is immaterial that, for the purposes of the statute, the stream should be regarded as navigable, just as was decided by this court in Barrett v. Metcalf.

We further think that the question cannot be resolved differently, because through a series of acts the Legislature has declared the waters of such streams to belong to the public, or to be the property of the state. Our attention has not been called to any statute, whereby the rights of appellants as riparian owners were reserved, divested, or limited, existing at the time or prior to the grants or patents to those under whom they claim. In Martin v. Burr, the Supreme Court recognized that a riparian right in such a stream as Spring creek was an appurtenant to the land fronting on the stream, in the nature of an incorporeal hereditament. From the facts in the record, it appears that this right passed to appellants' remote vendors, unaffected by any existing statutes, or by any restrictions or limitations in the grants. It follows, we think, that no statute could divest or transfer their rights to another without compensation; and it is immaterial to inquire whether such attempted divesture or transfer was to a public or private use. Our Constitution forbids such a taking in either case.

[6] The next question to be discussed is suggested by the claim of appellees that appellants are precluded from appropriating any of the water of Spring creek in the reservoir formed by appellees' dam, because they made an application to the board of water engineers of the state of Texas for a permit to use such water, and, upon a hearing of the application, the board refused to issue a permit to appellants; and because the defendants have not appealed from such decree of the board. As against this proposition, appellants urge that it was not within the power of the Legislature to invest the board of water engineers with judicial authority, and that the decree of the board referred to is a nullity, because it involved the exercise of judicial power, and that such decree does not conclude the rights of appellants, nor add to the rights of the appellees.

The authority invoked by appellants on this point is the case of Board of Water Engineers et al. v. McKnight, 229 S. W. 301, a decision by our Supreme Court. That case involved certain sections of the act of March 19, 1917, chapter 88, being articles 5011½f and 5011½ss of the Supplement to Vernon's Sayles' Texas Civil Statutes. It was held that the effect of these articles was to confer upon the board of water engineers the power to determine and adjudicate vested water rights, and to give its determination, when not appealed from, the effect of a judgment; and therefore such articles were in violation of the Constitution, dividing the powers of government into three departments, and vesting the judicial power in the courts. In a very clear and able opinion by Mr. Justice Greenwood, the conclusion was reached that those statutes sought to confer on persons belonging to the executive department powers properly attaching to the judicial department, without express permission of the Constitution, and that they were therefore void. In concluding the discussion, Mr. Justice Greenwood used this language:

"In order to make the determinations required of the board of water engineers in Texas, they must decide the most intricate questions of law and of fact—questions with respect to the validity and superiority of land titles, questions of contract, questions of boundary, questions of limitations, and questions of prescription. An inquiry involving such questions and resulting in the binding adjudication of property rights is strictly judicial, and we would not uphold the Constitution as it is plainly written were we to sanction the delegation of the power to conduct and to finally determine such an inquiry to any other tribunal than the courts.

"It was pointed out in M., K. & T. Ry. Co. of Tex. v. Shannon, 100 Tex. 389, 100 S. W. 141, 10 L. R. A. (N. S.) 681, that it is the peculiar province of our courts 'to hear and determine causes between parties affecting the rights of persons as to their life, liberty, and property.'"

It is argued for appellees that this case is not in point here, because the court only undertook to declare unconstitutional certain specific provisions of the act, and that the scope of the decision is limited to those particular articles. But, manifestly, the question is the same if other articles of the statute relied upon by appellees are subject to the same objection, namely, the vesting in the board of water engineers the right to exercise judicial power. The decree of the board in the hearing of the application in

question is set out in the statement of facts and in the pleadings of plaintiffs, and shows that there was a formal hearing of the application, including the formal protest and objections of the appellees in this case, and of other riparian owners, and the Motl heirs are shown to have filed with the board the certified copy of their original declaration of appropriation, and that they expressly claimed prior rights and ownerships to the reservoir and the water therein. The objections specifically were that the Motl heirs had priority over R. W. Boyd, the applicant. The order on its face shows that the board entered upon a full hearing of the facts, together with the law applicable thereto, and considered the certified filings, protests, and the affidavits filed in support thereof, and made their order upon both the facts and their conclusions as to the law governing the case.

It is claimed that this order had the effect to deprive appellants of their property rights in the use of the water, if they had any, by virtue of the denial of the permit. In so far as appellants' rights depend upon this decree or determination by the board, wherein it is claimed that their rights were taken, admittedly without compensation and without condemnation, it would seem clear that the essence of this action by the board was judicial, and that appellees acquired no rights through such order. It is quite apparent from the terms of the order itself that the board undertook to adjudicate questions of prior appropriation, with probably the incidental questions of prescription and limitation, upon which appellees were then basing their claim to the water. These are matters which the Supreme Court, in the McKnight Case, said the Legislature was without power to authorize a board of water engineers to decide.

It is argued for appellees that, the state having title to the bed of the stream, it was within the power of the Legislature to vest the board of water engineers with the administrative duty and power to control the distribution of the unappropriated waters of such stream among the persons entitled thereto. This has been held in some decisions from other states, but some of them are reviewed in the opinion in the McKnight Case, and the Supreme Court declined to follow that view. Whatever force there may be in the arguments made for the validity of the statute giving the board power to conclude property rights by denying permits, we are controlled by the conclusions announced by the Supreme Court, but it is proper to add that we fully concur in the reasoning and conclusions in the McKnight Case.

It may be conceded that the articles invoked by the appellees in the present case are not those specifically named and held void in the McKnight Case, but we cannot at all agree with the contention that they are different in principle. It is said that the articles condemned by the Supreme Court were those in which the board was authorized to determine the relative right of claimants, and that this distinguishes the two cases. An examination of the articles cited here by appellees, however, shows that they are very similar to those declared void. Provision is made for application for permits, and it is expressly made the duty of the board to reject all applications and to refuse the permit asked for, if there is no unappropriated water, or if the proposed use conflicts with existing water rights, or is detrimental to the public welfare, and negatively it is forbidden to issue a permit which impairs existing water rights or vested riparian rights, or is detrimental to the public welfare. A hearing is provided for, with provision for protests and objections, the hearing of evidence, and a decision in writing, approving or rejecting the application. Penalties are provided for for appropriating or diverting water without complying with the provisions of the act. It is plain, we think, that these articles are in all substantial respects the same, as to the question now being considered, as those nullified by the Supreme Court. The power of determining the questions involved in the hearing of the application is as much judicial in the one case as in the other. When a hearing is had, and the application is protested because of the claim of prior existing rights or appropriations, and a decision is rendered denying the permit, the board has necessarily exercised judicial authority, if it is sought to give its decision the effect of denying property rights. Furthermore, there is necessarily in such case a determination of the relative rights of the parties, at least as to the matter of priority and exclusiveness. This is exactly the effect which is sought to be given the order of the board in this case, and we think it must be held to be a nullity, in so far as it is sought to deny appellants a recourse to the courts for the adjudication of their riparian rights.

These are the controlling questions in the case, but we have considered all the issues suggested in the briefs of the respective parties, and have concluded that the temporary injunction in this case cannot be upheld, and that the motion to dissolve should have been granted. Therefore the case will be reversed and remanded for trial, with instructions to the lower court to dissolve the injunction. The costs of the appeal will be taxed against appellees.

In this opinion, we have not discussed the constitutional amendment (section 59a, art. 16) adopted August 21, 1917, to which reference is made by appellees' counsel, but no specific argument thereon made. As far as

we can discern, such constitutional provision has no application to this case, at least any favorable to appellees, for the reason that their claims are not based on any acts or things done pursuant to such constitutional provision or any statute thereunder.

We have not discussed the question of estoppel, for the facts did not raise the issue. Neither have we discussed the effect of the verbal consent given by Lee, appellants' remote vendor, to the erection of the dam, for the reason that the facts show it was wholly insufficient, of itself, upon which to base any legal or equitable rights.

We also think it proper to say that we have not undertaken, and, in the very nature of things, cannot lay down any rule for the guidance of the trial court in determining the difficult questions which may confront it upon the final trial of the cause, if it should be called upon to define the relative rights, in the use of the water in Spring creek, of the plaintiffs and defendants. Our holding is simply that, under the pleadings and facts on the hearing of the motion to dissolve, appellants should not have been deprived absolutely of their just proportion of the water, as was done by the injunction granted. If the parties shall not come to some equitable arrangement in sharing the use of the water, their rights will depend upon the final pleadings and the facts proven concerning their needs and the justness of the proportions claimed. These are matters upon which, obviously, we cannot express any opinion.

Reversed and remanded, with instructions.

Reversed and remanded.

⚖➡For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes