## CHARLES C. MOTL ET AL. V. R. W. BOYD ET AL.

### No. 3740. Decided June 26, 1926.
### (286 S. W., 458).

**1.—Injunction—Riparian Rights—Navigable Stream.**

Reviewing in detail the various laws under which lands in Texas have been granted (Colonization laws of Mexico, of Coahuila and Texas, of Tamaulipas, and statutes and constitutions of the Republic and of the State of Texas), it is held that rights of riparian owners to the use of the waters of all streams in the State, both for domestic use and for irrigation purposes, and whether on streams navigable by nature or by statutory definition, or on those not so, were recognized as a part of such grants when made up to the passage of the water appropriation Act of 1889. (Pp. 99-108).

**2.—Rivers and Water Courses—Bed, Banks, and Water-flow.**

A river or stream consists of its bed (that portion alternately covered or left bare by the increase or diminution in the supply of water and adequate to contain it at its average and mean stage throughout the year, without reference to freshets); its banks (the water-washed and relatively permanent elevations at the outer lines of and separating the bed from adjacent uplands and serving to confine its waters to the bed and to a definite channel); and the flow of water. (Pp. 108, 109).

**3.—Same—Navigable Stream—Statute.**

A navigable stream, within the meaning of Article 5302, Rev. Stats., is one maintaining an average width of more than thirty feet of bed between its fast banks, although the waters flow, in an ordinary season, over less than thirty feet of this width. The stream here involved (Spring Creek) is held a navigable one under the statute and its waters held in trust by the State for the use of riparian proprietors for irrigation purposes. (Pp. 108-111).

**4.—Same—Riparian Rights—Floods and Their Prevention.**

Examining the physiographic and geologic features of Texas and its streams, it is held that the irrigation rights of riparian owners thereon are limited to the ordinary and normal flow. They do not extend to their flood waters, destructive rather than beneficial, and to be dealt with by the State for the prevention of great public calamities, as by drainage, by levees, or by impounding in storage reservoirs. Flood waters are not riparian waters. (Pp. 111-124).

**5.—Same—Reclamation—Statutes.**

Examining the various statutes and constitutional provisions covering irrigation, flood prevention, reclamation, etc., it is held that they preserve throughout a distinction between rights in the normal flow of streams, and those in flood waters, and recognize no rights of riparian owners in the latter, but a duty of the State to control them in the general public interest. (Act of March 19, 1889, Laws, 21st Leg., p. 100; Act of March, 1895, Laws, 24th Leg., p. 21; Constitutional Amendment, 1904; Act of April, 1905, Laws, 29th Leg., p. 235; Act of April 9, 1913, Laws, 33d Leg., p. 358; Act of April 9, 1913, Laws, 33d Leg., p. 380; Act of March 19, 1917, Laws, 35th Leg., p. 172; Constitutional Amendment, 1917, Art. 16, Sec. 59.) (Pp. 118-124).

**6.—Regulating Appropriation for Irrigation—Riparian Rights.**

The right to appropriate for irrigation unappropriated portions of the normal flow and underflow of streams, given by the irrigation Acts of 1889 and 1895, was subject to the irrigation rights of riparian proprietors acquired by their previous grants of their lands. Such rights did not fall under the term unappropriated waters. They remained, as granted, rights to reasonable use for irrigation, subject to like rights of other riparians. (Pp. 118, 119).

**7.—Same—Flood Waters—Constitutional Law.**

The statutes of the State so far as they authorized the appropriation of its flood waters did not interfere with the rights of riparian proprietors and were constitutional and valid; nor were they invalid so far as they authorized the appropriation of streams without violation of vested rights. (Pp. 124-127).

**8.—Appropriation—Storm Waters—Board of Water Engineers.**

Riparian proprietors who were refused license from the Board of Water Engineers to appropriate for irrigation "unappropriated storm waters of the State" were not affected by such refusal in their rights as such proprietors to use for irrigation the normal flow of the stream, since this did not include any right in storm or flood waters and was not involved in the license sought. (Pp. 124-127).

**9.—Same—Judicial or Administrative Powers.**

The Board of Water Engineers, in granting or refusing a license to appropriate for irrigation purposes storm waters of the State, were performing a mere administrative office, not a judicial one. The mere granting or refusing a license determined no rights of others. Board of Water Engineers v. McKnight, 111 Texas, 82, distinguished. (P. 126).

**10.—Limitation—Use by Consent.**

Where the occupation and use of another's property is by consent no issue of limitation was involved in such use. (P. 127).

**11.—Same—Estoppel.**

Where a dam and ditches were constructed at considerable expense on the premises of a land owner and with his consent by the proprietor of land lower down the stream for its irrigation and the normal flow of the stream and the water impounded by such dam appropriated and so used for more than thirty years, such upper proprietor making no use of either for irrigation nor objecting to their appropriation by the lower, this was in effect a conveyance of their irrigation rights to the lower proprietor, and estopped them from themselves making such use of the water for irrigation of their land as would interfere with irrigation by the other. (Pp. 127-129).

Error to the Court of Civil Appeals for the Third District, in an appeal from Tom Green County.

Motl and others sued Boyd and White for injunction to restrain them from using the waters of a certain creek for irrigation. Appeal was taken by defendants on the overruling of

their motion to dissolve a temporary injunction granted in plaintiff's favor. This ruling was reversed by the Court of Civil Appeals (Boyd v. Motl, 236 S. W., 487) whereupon appellees (plaintiffs) obtained writ of error.

*Hill & Hill, Gaines & Gaines, Seabury, George & Taylor, Andrews, Streetman, Logue & Mobley,* and *Hudson & Starley,* for plaintiffs in error.

The State, by reason of its sovereign power, is vested with and has at all times reserved and exercised the ownership and control of all of the waters in all of its statutory navigable streams, and may, through the Legislature, provide for the conservation, control, appropriation, diversion and use thereof for irrigation purposes, and one complying with the provisions so made acquires a prior right to take and use such waters for irrigation purposes to the extent of the appropriation. Act of Dec. 14, 1837, Sections 21 and 42; Gammel's Laws, Vol. 1, pp. 1412 and 1418; Rev. Stats. 1911, Art. 5338; City of Austin v. Hall, 93 Texas, 591; Landry v. Robison, 110 Texas, 295; Rundle v. Delaware and Raritan Canal Co., 14 Howard, 80.

The Court of Civil Appeals erroneously held and decided that defendants in error, as riparian owners of land lying along the banks of Spring Creek and the reservoir therein formed and created by the dam of plaintiffs in error, had the right, without a permit from the Board of Water Engineers, or a water right secured under the statutes of the State, to divert the waters from the natural channels of said stream and reservoir therein and appropriate and use the same for the purpose of irrigation.

Gammel's Laws, Vol. 1, pp. 1412 and 1418; Hartley's Digest, Articles 1857 and 1878; Oldham & White's Digest, Articles 1194-1185; Paschal's Digest, Articles 4529-4530; Rev. Stats., 1879, Art. 3911; Rev. Stats., 1895, Art. 4147; Rev. Stats., 1911, Art. 5338; City of Austin v. Hall, 93 Texas, 591; Landry v. Robison, 110 Texas, 295; Petty v. City of San Antonio, 181 S. W., 224, writ of error refused, 108 Texas, 630; Siddall v. Hudson, 217 S. W., 1115; Moore v. City of Dallas, 200 S. W., 870.

The Court of Civil Appeals erroneously held and decided that, the riparian right in the statutory navigable streams of the State is such a property right appurtenant to and belonging to the land bordering and abutting on such streams as invests the owner of the land with authority and right, free from the control and supervision of the State, to divert the waters of such stream from the natural channels and use it in the irrigation of such lands. Same authorities.

There is and can be no property right in the waters of the natural streams of the State, but only the right in the use thereof by those entitled thereto, and the State having the right of control of the waters in the natural channels of such streams for all purposes, other than for domestic uses, had the power to create the Board of Water Engineers as an administrative body to direct and control the conservation and the diversion and distribution of such waters from the channels of the streams in the manner and for the purposes provided by the law; and in performing the duties so imposed upon them, the Board is exercising only an administrative authority and may lawfully determine whether there is any water at the point where diversion is applied for that is subject to diversion and use for irrigation. Chap. 88, Act March 19, 1917, Acts 1917, page 211.

The Court of Civil Appeals erroneously held and decided that, notwithstanding it was shown that Spring Creek was a statutory navigable stream, and the waters thereof conceded to be the property of the State, and that plaintiffs in error and their vendors had accepted the State's offer under the act of the Legislature, approved Aug. 21, 1876, of the free use of the waters thereof for irrigation, and had impounded and diverted the same in accordance with said act, and the Irrigation Acts of 1889, 1895, 1913 and 1917, that the Legislature was without power to prohibit and make it unlawful for the owners of land lying along the banks of said stream to divert, except for domestic use, the waters from the natural channel thereof in any manner and to the extent of depriving plaintiffs in error of the priority in the use of said waters to which they were entitled under their prior appropriation. Act of 1876, Gammel's Laws, Vol. 8, p. 1089; Act of 1889, Gammel's Laws, Vol. 9, p. 1126; Act of 1895, Gammel's Laws, Vol. 10, pp. 751, 757; Acts of 1913, p. 358; Acts of 1917, p. 211.

The State being the owner of the bed and channel of Spring Creek, and plaintiffs in error's dam across the same having been constructed in 1886, for the purpose of storing waters therein for irrigation, and thereafter continuously maintained for that purpose, they acquired and were vested by Section 49a of the Act approved April 9, 1913, and Section 47 of the Act approved March 19, 1917, in the right to appropriate the ordinary flow and under flow, and the storm, flood and rain waters of said creek in the amounts and quantities equal to the holding capacity of said dam, and defendants in error had no right to take or

divert such stored waters, except in the manner and on the conditions provided in said act. Act of 1917, Sec. 47, p. 222.

The vendor of the ancestor of the plaintiffs in error having made and filed in 1889 an appropriation of the waters of Spring Creek impounded by their dam as required by the act approved March 19, 1889, and a certified copy of such appropriation having been filed with the Board of Water Engineers in December, 1920, and plaintiffs in error, having made use of the waters under the terms of the filing made in 1889 for a period of more than three years after the Act of March 19, 1917, took effect, they acquired title to such appropriation by limitation as against defendants in error as riparian owners upon said stream. Act of 1917, Sec. 83, Vernon's Sayles' Civ. Stats., 1918; Supp., Art. 5011, C. C.

The Board of Water Engineers under Sec. 59, Art. 16, of the Constitutional Amendment, adopted Aug. 21, 1917, had power under Chap. 88, General Laws, Regular Session, Thirty-fifth Legislature, to hear and determine the rights of plaintiffs and defendants in error in the diversion and use of the waters impounded by the dam of plaintiffs in error in Spring Creek for purposes of irrigation. Sec. 59, Art. 16 of the Constitution, Complete Texas Statutes, 1920, p. 44; Gammel's Laws of Texas, Vol. 9, p. 1128; Gammel's Laws of Texas, Vol. 10, p. 751; Acts of 1913, p. 358; Acts of 1917, p. 211.

The waters of the natural streams of the State, and particularly those streams declared by law as navigable, being in the State and subject to its control, the Legislature had the constitutional right and power to pass any laws in its judgment necessary or proper for the conservation and control thereof, and prescribe the conditions on which rights could be acquired therein, and to grant rights therein and prohibit the diversion of the water thereof from the natural channels of the streams for use in irrigation. Same authorities.

The owner of the lands now owned by defendants in error having consented to the construction of said dam in 1886, and the flowing of his said land thereby, and said dam having been continuously and uninterruptedly maintained, and said lands flowed thereby for more than 35 years, with the knowledge of and without any objection from the vendors of defendants in error, and they having stood by and seen the plaintiffs in error at a heavy outlay of money and labor, reconstruct said original dam with a concrete dam, and the defendants in error having purchased said land with knowledge and notice of the rights of

plaintiffs in error, said defendants in error are estopped to deny the right of plaintiffs in error to maintain said dam and reservoir and to appropriate and use the waters thereof to its full capacity. for the irrigation of their said farm.

It is a well settled principle of law that a parol license becomes an irrevocable license when founded on consideration, or when the party making the improvement invests capital and expense in the enterprise. Harrison v. Boring, 44 Texas, 255; Thomas v. Irrigation Co., 80 Texas, 550; Risien v. Brown, 73 Texas, 135; Kinney on Irrigation and Water Rights, pp. 1738-1743; Flickinger v. Shaw, 87 Cal., 126, 11 L. R. A., 134; Rerick v. Kern, 14 Sergant and Rawle, 267, 16 Am. Dec. 497; Shaw v. Profitt, 110 Pac., 1092; Maple Orchard Grove & Vineyard Co. v. Marshall, 75 Pac., 369; Curtis v. La Grande Water Co., 23 Pac., 808.

The act of plaintiffs in error, their ancestor and his vendors, immediate and remote, accepting the offer of the State as contained in said Act of 1876, under a claim of right and title by the State to the waters of said stream, and the maintenance of said dam and reservoir, with the use of the waters therefrom for irrigation for 35 years under said act, and the act of March 19, 1889, and subsequent acts, asserting in the State a right and claim to, and dominion over the waters of said stream, and granting plaintiffs in error, their ancestors and his vendors, the prior right in the use of the said impounded waters of said stream for irrigation, and limiting the right of defendants in error and their vendors to the unappropriated waters thereof for irrigation, constituted and was a claim and assertion of right in the appropriation and use for irrigation of the waters of said stream so impounded by said dam, adverse to the defendants in error and their vendors, and plaintiffs in error acquired thereby, and hold by prescription and limitation as against defendants in error, the right in the use of the waters impounded in said reservoir for the irrigation of their said farm. Oregon Const. Co. v. Allen Ditch Co., 41 Ore., 209, 69 Pac., 455; Alta Land and Water Co. v. Hancock, 85 Calif., 219; Kohler v. United Irrigation Co., 222 S. W., 337.

The following States, at least, adhere to the rule that navigable fresh water streams are public rivers: Alabama: Mobile v. Esclava, 9 Port. (Ala.), 597, 33 Am. Dec., 325; Hess v. Cheney, 83 Ala., 251, 3 So., 791. Arkansas: St. Louis, etc., R. Co. v. Ramsey, 53 Ark., 314, 13 S. W., 931, 22 Am. St. Rep., 195; State v. Southern, etc., Co., 167 S. W., 854. California: People v. Gold Run, etc., Co., 66 Cal., 138, 56 Am. St. Rep., 80, 4 Pac., 1152; Packer v. Bird, 11 Pac., 873. Florida: State v. Black River

Phosphate Co., 27 Fla., 276, 9 So., 205; Broward v. Mabry, 50 So., 826. Idaho: Scott v. Lattig, 227 U. S., 229, 57 L. Ed., 490, 33 S. Ct., 242; Callahan v. Price, 146 Pac., 732. Indiana: Ross v. Faust, 54 Ind., 471, 23 Am. Rep., 655. Illinois: Wilton v. Van Hessen, 94 N. E., 134; Bliss v. Ward, 64 N. E., 705. Iowa: McManus v. Carmichael, 3 Iowa, 1, and many later cases, especially Tomlin v. R. R. Co., 32 Iowa, 106, and State of Iowa v. Carr, 191 Fed., 257. Kansas: Wood v. Fowler, 26 Kan., 682, 40 Am. Rep., 330; State v. Akers, 140 Pac. 637. Louisiana: Caddo Levee Dist. v. Glassel, 45 So., 370. Michigan: Ainsworth v. Munoskong, etc., Club, 123 N. W., 802. Minnesota: Cather v. Steamboat Dr. Franklin, 1 Minn., 73, 78, and many later cases. See also Hall v. Hobart, 186 Fed., 426. Missouri: O'Fallon v. Daggett, 4 Mo., 343 (civil law rule, involving Spanish grants on the Mississippi); Benson v. Morrow, 61 Mo., 345; Cooley v. Golden, 117 Mo., 33, 23 S. W., 100. Nevada: Shoemaker v. Hatch, 13 Nev., 261. New York: People v. Canal Appraisers, 33 N. Y., 461; West Virginia Pulp, etc., Co. v. Peck, 143 N. Y. S., 720. (Doctrine limited to Mohawk and Genesee Rivers.) North Carolina: Wilson v. Forbes, 2 Dev., 30; State v. Pool, 74 N. C., 402, 407; State v. Tomlinson, 77 N. C., 528; and many earlier and later cases. Oklahoma: State v. Nolegs, 139 Pac., 943. Oregon: Salem Impr. Co. v. Court, 26 Or., 93, 41 Pac., 1105; State v. Portland, etc., Co., 95 Pac., 722, 98 Pac., 160. Pennsylvania: Carson v. Blazer, 2 Binn., 475, 4 Am. Dec., 463, and many later cases, particularly Flanagan v. Philadelphia, 42 Pa., 519. South Carolina: Cates v. Wadlington, 1 McCord, 580. South Dakota: Flierand v. Madden, 152 N. W., 796. Tennessee: Elder v. Burrus, 6 Hump., 358; Goodwin v. Thompson, 15 Lea., 209, 54 Am. Rep., 410; State v. Muncie Pulp Co., 104 S. W., 437; State v. Tennessee Land Co., 158 S. W., 746. Texas: City of Austin v. Hall, 93 Texas, 591. Virginia: Norfolk City v. Cooke, 22 Gratt., 430. Washington: Const., Art. 27, Sec. 1; Corrigan v. Brown, 169 Fed., 477.

Those American States that base the distinction between public and private waters, not on tidal flow, but on navigability, assert the rule to be that in public streams (navigable rivers), the State may divert for a public purpose any of the water it needs without compensating anyone for it, provided the public right of navigation is not materially impaired, and provided sufficient flow remains for the ordinary purposes of the riparian proprietors, and that it may grant this right of diversion to others for like purposes subject to the same restrictions; but that, in private streams (unnavigable rivers), water cannot be

diverted by the State, even for public purposes, without compensating the riparian proprietors even if sufficient flow remains for their ordinary purposes.  People ex rel. Loomis v. Canal Appraisers, 33 N. Y., 461; Crill v. Rome (N. Y.), 47 How. Pr., 398; Rundle v. Delaware & R. Canal Co., 14 How., 80, 14 L. Ed., 335; Susquehanna Canal Co. v. Wright, 9 Watts & S., 9, 42 Am. Dec. 312; Minneapolis Mill Co. v. Water Comrs., 56 Minn., 485, 58 N. W., 33 (affirmed in 168 U. S., 349, 42 L. Ed., 497, 18 S. Ct., 157) ; Comrs. of Homochitto River v. Withers, 29 Miss., 21, 64 Am. Dec., 126; La Plaisance Bay Harbor Co. v. City of Monroe (Mich.), Walk. Ch., 155; Board of Park Comrs. v. Diamond Ice Co., 130 Iowa, 603, 105 N. W., 203; State ex rel. Thompson v. Parker, 132 Ark., 316, 200 S. W., 1014; Johnson v. Burghon (Mich.), 179 N. W., 225, case note in 11 A. L. R., 241.

*Blanks, Collins & Jackson,* for defendants in error.

The courts of this State take judicial cognizance that Spring Creek is not a navigable stream in fact, and it is not within the definition of "navigable streams" under the provisions of Sec. 42 of the Act of 1837, or any other statutes of Texas.

The definition of navigable streams contained in the Acts of Congress of the Republic of Texas in 1837, above referred to, had application as a directory provision only to surveys of public lands, and has no application to navigability of streams vel non as affecting irrigation rights in the semi-arid sections of Texas.

The purpose of Sec. 42 of the Act of 1837 was not to conserve in the government the title to and control over streams upon which surveys abutted, but was to facilitate the use and convenience of the water to as many riparian proprietors as possible, and such being its purpose the Common Law Rule was not abrogated or changed. Authorities: Barrett v. Metcalfe, 33 S. W., 758; Long v. Boone Co., 36 Iowa, 60; Aronfield v. State, 27 Ind. App., 488, 61 N. E., 693; Bouvier's Law Dic., "Stream"; Black's Law Dic., "Stream"; City of Austin v. Hall, 93 Texas, 591; Bunnell v. Sugg, 135 S. W., 201; 1 Farnham on Water Rights, 262; Rhodes v. Whitehead, 27 Texas, 304; Poynter v. Chipman, 8 Utah, 442; City of Victoria v. Schott, 29 S. W., 681; 9 Corpus Juris, 187; Dutton v. Vierling, 152 S. W., 450; Braxon v. Bessler, 64 Ill., 488; Murray v. Preston, 106 Ky., 561, 50 S. W., 1095.

The English Common Law with reference to riparian rights, as such law is extended by common consent in all the Western arid and semi-arid sections of the United States to include irrigation as a necessary natural use of water, is, and has always

been, recognized by the courts as applicable to riparian rights in the arid and semi-arid sections of Texas, and is so firmly established as to be a rule of property which the courts cannot properly do other than respect and maintain.

Spring Creek not being a navigable stream either in fact or legal fiction, and the lands of defendant having been patented to their predecessors in title by the State of Texas in 1857, without reservation or restriction, the legal title to and the absolute vested right of use of the water in the stream to the middle of the channel was vested in the patentees of these lands as effectually as if the grant called to run to the thread of the stream, and is an incorporeal hereditament appurtenant to the lands of defendants, and a vested right, which the Legislature of the State had no power to constitutionally provide for the acquisition of by another proprietor without due process of law and compensation to the riparian owners whose rights are attempted to be so appropriated.

Whether navigable or non-navigable "subject to the right of natural use by other riparian proprietors, each riparian owner is entitled to use the water of a stream which flows by or through his land for the purposes of irrigation; provided, such use is reasonable, considering all of the circumstances and conditions under which it is made" (quoting J. Brown in Watkins v. Clements, 98 Texas, 578), and this right is a vested property right in the nature of an incorporeal hereditament of which the owner cannot be divested, except by condemnation for public use and upon compensation paid.

The Act of 1876 did not give the "free use of the water" in such streams (or any streams) to the party first filing affidavit and map for purposes of irrigation, but such rights were only conceded for navigation, and such Act and the Acts of 1889 and 1895 and other similar acts to the extent that they attempted to confer such rights, without providing compensation to the owner of the riparian rights so appropriated, contravened the provisions of the Constitution prohibiting the taking of property without compensation and without due process of law.

"Sec. 2 of the Act (of 1889, and similar provisions in the Act of 1895 and other similar acts) (words in parenthesis ours) cannot operate, and probably was not intended to operate, on the rights of riparian owners, existing when the law was passed, but was intended to operate only on such interests as were in the State by reason of its ownership of lands bordering on rivers or natural streams" (quoting C. J. Stayton) in McGhee Irrigating Ditch Co. v. Hudson, 22 S. W., 967.   Authorities: Watkins

Ld. Mtg. Co. v. Clements, 98 Texas, 578; 1 Farnham on Water Rights, 280; 3 Id., Sec. 599, 603; Crawford Co. v. Hathaway, 93 N. W., 781; McGhee Irrig. Ditch Co. v. Hudson, 22 S. W., 967; Barrett v. Metcalfe, 33 S. W., 758; Mud Creek Irrig. etc. Co. v. Vivian, 74 Texas, 170.

If validity is conceded (which we do not concede) to the Acts of the Legislature creating the Board of Water Engineers and investing such board with authority to hear and determine applications for permits to use water, and to apportion such water between "conflicting interests," the decree of the Board of Water Engineers in the instant case denying defendants the use of any water out of the creek opposite their lands was wholly void; and neither added to the rights of plaintiffs, nor detracted from the rights of defendants, because Spring Creek, not being a navigable stream, and the State having no property therein nor control thereof, the waters therein were the private property of the abutting property owners and were never under the control nor jurisdiction of the Board of Water Engineers, and it was not competent for the Legislature to undertake by any sort of legislation to divest the riparian owners of their rights therein and control thereof and place same in a Board of Water Engineers. Authorities: Acts of 1913, Sec. 48, p. 358; Acts of 1917, Ch. 88, Sec. 45; Tulare Water Co. v. State Water Commission, 20 Pac., 874; Board of Water Engineers v. McKnight, 229 S. W., 301.

The question of limitation is conclusively settled by the opinion of the Court of Civil Appeals and the authorities cited therein. See, also, 2 Farnham on Water Rights, Secs. 536, 537; San Joaquin, etc., Irrig. Co. v. Worswick, 203 Pac., 999; Kinney on Irrigation and Water Rights, Arts. 1880, 1858, 1863-1865, 2923, 2937, 2949, 2950; Crawford Co. v. Hathaway, 93 N. W., 781.

But if it be determined by this Court that Spring Creek is "navigable" in the instant case, it being shown without contradiction that there remained in the bed of the creek after plaintiffs had appropriated all the water they could run down their ditch, more than six times enough unappropriated water to irrigate all of defendants' lands, the board had no other discretion under the law creating it than to exercise the simple administrative function of awarding a permit to defendants for the use of such water.

And their action in failing and refusing to exercise such administrative authority and issue appropriate permit to defendants, and assuming to adjudicate questions of prior appropriation, limitation and prescription, was the unlawful exercise of

a judicial function, which, under our Constitution, is vested solely in the courts.

And in effect amounted to the confiscation of defendants' property rights without compensation and without due process of law, and the bestowal of them without competent authority on the plaintiffs.

The facts in this case do not raise the issue of estoppel. 3 Farnham, p. 1311.

The following attorneys filed briefs and arguments on questions here involved as *amici curiae* by permission of the court, and on behalf of various clients whose interests would be affected by the decision: *Seay, Malone & Lipscomb,* and *D. W. Glasscock; C. R. Wharton; J. E. Starley; John M. Corbett; Crate Dalton; Lindsley M. Brown; J. A. Drane* and *Palmer & Russell;* and *Clay Cooke.*

MR. ·CHIEF JUSTICE CURETON delivered the opinion of the court.

### STATEMENT OF THE CASE.

This suit was filed in the District Court of Tom Green County by plaintiffs, Charles C. Motl and others, for an injunction restraining the defendants, R. W. Boyd and H. C. White, from pumping water for irrigation purposes from a reservoir in Spring Creek created by a dam built in 1886 by the remote vendors of the plaintiffs adjacent to lands now owned by defendants. A temporary injunction was granted restraining the defendants from pumping the water from said reservoir for the purpose of irrigating their riparian land. The case was tried on motion to dissolve, and the temporary injunction previously granted was modified so as to permit the defendants to divert the waters from the reservoir when the same were running over the dam of plaintiffs. Otherwise the motion was overruled. The defendants appealed to the Court of Civil Appeals for the Third District, which· reversed the judgment of the trial court, and remanded the cause to the District Court with instructions to dissolve the temporary injunction. 236 S. W., 487. The case is before us on writ of error granted the plaintiffs, Charles C. Motl and others.

The plaintiffs are owners in fee simple of about 914 acres of land located in Tom Green County, known as the "Twin Mountain Farm," situated on and riparian to Spring Creek. The lands were originally the property of Charles Motl and wife, both deceased, and the plaintiffs are their heirs. The defendants

are fee simple owners of about 160 acres of land in Tom Green County, situated on and riparian to Spring Creek, but approximately four miles up the creek from the lands of the plaintiffs. The defendants' lands are out of two different surveys, one being Survey 656 and the other Survey 655, patented in 1857.

Spring Creek is a natural stream, tributary to the South Concho River, emptying into the Concho above the lands belonging to the plaintiffs. It has a well defined channel, and the bed has an average width, from its mouth to practically its head, of more than thirty feet; but the waterflow therein in ordinary seasons is less than thirty feet wide, and none of the survey lines bordering thereon cross the same. The lands of both plaintiffs and defendants are within the arid portions of the State, in which, by reason of insufficient rainfall, irrigation is necessary for agricultural purposes.

In 1886 John R. Nasworthy, who owned the "Twin Mountain Farm," contracted to sell and convey it to one William Lackey as soon as the *latter should procure irrigation for the same and place it in cultivation.* At that time one P. C. Lee, a predecessor in title of the defendants, owned the said Surveys 655 and 656. Lackey and Nasworthy approached Lee, requested and obtained his verbal consent to erect a dam and ditch on the lands now owned by the defendants, and at the places where are now located the dam and ditch involved in this suit. In the spring of 1886 Lackey proceeded with the construction, and built a wooden and earthen dam across Spring Creek on Survey 655, the northern end of the dam being on a part of one of the surveys now owned by defendants. By means of this dam Lackey impounded the waters of the creek, backing the same up the creek. He also constructed a ditch from the dam and its reservoir through Survey 655, down and over the "Twin Mountain Farm," and put in cultivation that year about 700 acres of the farm, which he irrigated.

On October 20, 1886, John R. Nasworthy, who actually owned the land, in compliance with his agreement with Lackey conveyed to the latter, by general warranty deed, said "Twin Mountain Farm." Lackey continued to take and appropriate the waters by means of the dam and ditch referred to, and to irrigate about 700 acres of said farm therewith, from the time he began continuously until October 15, 1886—on which date he sold and conveyed the farm, dam, and ditch to J. S. Fowlkes, for a consideration of $12,500. The said Fowlkes continued to take and appropriate said waters by means of said dam and ditch, and to

irrigate and cultivate said farm, continuously from the time of his purchase until he sold the same to Charles Motl, the ancestor of plaintiffs, in 1899, as hereinafter detailed.

In 1889, and while he owned said farm and ditch, Fowlkes, for the purpose of complying with the Irrigation Act of 1889, made and filed the following affidavit:

"The State of Texas, County of Tom Green.

"I, J. S. Fowlkes, of the County and State aforesaid, owner of the Twin Mountain Farm, do make and subscribe the following sworn statement under and by virtue of the provisions of Chapter 88 of the General Laws of Texas, passed by the Twenty-first Legislature thereof, approved March 19, 1889, entitled 'An Act to Encourage Irrigation,' etc.

"1st: I have had constructed and purchased part heretofore constructed, an irrigating ditch in Tom Green County, Texas, the name of said ditch being the Twin Mountain Farm Ditch.

"2nd: The head gate of said ditch is situated on Spring Creek on Survey No. 656, in the name of the German Emigration Company.

"3rd: The size and dimensions of said ditch are as follows: Width at top, 166 inches; width at bottom, 108 inches, depth 15 inches, and the carrying capacity or flow of said ditch is 17.84 cubic feet of water per second of time.

"4th: The water is taken from Spring Creek and flows through said ditch, as shown by the map hereto attached."

This affidavit, signed and sworn to by said Fowlkes on November 21, 1889, accompanied by a map, showing said farm, dam, and ditch, was filed by Fowlkes for record with the County Clerk of Tom Green County, the county in which the head gate of said ditch was and is situated, and was recorded by said clerk in the Irrigation Ditch Records of said county.

On November 13, 1899, Fowlkes, for a consideration of $15,-000, sold and conveyed to Charles Motl, the ancestor of the plaintiffs, the "Twin Mountain Farm," and *also the dam and irrigating ditch which supplies said lands with water for irrigating, the same being known as the Twin Mountain Farm, dam, and ditch, and all water rights and privileges secured by said dam and ditch,* except, however, the right of W. M. Johnson to irrigate his farm, being six hours of water every eight days, to which said Johnson is entitled, and except said right of Johnson, especially reserved, *the entire right to said dam and ditch and the water supply of same is hereby conveyed to said Motl.*" (Italics ours.)

At the time of this sale and purchase, farms not irrigated were selling at about $5 per acre. At that time the then owners of Surveys 655 and 656 lived at San Angelo, about ten miles from the farm, dam, and ditch, and it was generally known in said town that said "Twin Mountain Farm" was being irrigated from water obtained from the dam, ditch, and reservoir on said surveys, and no objection was made at that time by the owners of these surveys to the diversion and appropriation of such waters. At that time the owners of Surveys 655 and 656 were using them for pasturage purposes only, and had no use for the water in the creek, except for domestic and stock raising purposes, and there was plenty of water there for said purposes in addition to that which was being appropriated and used for irrigation by Charles Motl.

In the years 1907 and 1908 Charles Motl rebuilt the original dam put in by Lackey with a concrete dam, at an actual cost and outlay in money of about $1,500, besides the labor of himself and his boys. The concrete dam is at the same point as the original one, and is of substantially the same height, and the ditch leading from it is approximately the same size as the original ditch, and is capable and has diverted, except in later years, when there was a scarcity of water, approximately the same amount of water for irrigating the "Twin Mountain Farm" as it did when originally built. The dam is a substantial structure, some eight feet high, four to six feet wide at the base, 32 inches at the top, 425 feet long, and forms a reservoir approximately 8,400 feet long, covering about 105 acres, with a holding capacity of approximately 650-acre feet.

Motl, from the time he purchased the farm until his death in 1917, did, and the plaintiffs after his death have, continuously and uninterruptedly diverted and appropriated the waters of Spring Creek by means of the dams and ditches described, and have used the same in irrigating and cultivating crops on the "Twin Mountain Farm." During all this time, until more recent years, they have irrigated and cultivated between 600 and 700 acres, and have diverted and appropriated for that purpose *all the waters of Spring Creek that their ditch and dam would furnish.* In recent years the waters of said creek have been so diminished, by reason of diversion and use for irrigation above their dam, that they have not been able to get sufficient water to irrigate their whole farm, irrigating and cultivating only between 400 and 500 acres of it. During the winter months, when there was not much irrigation on the river above them, the supply of water was larger, but since

about the year 1909 the water in said creek impounded by the plaintiffs has been sufficient to furnish water for irrigating the lower part of said farm only to the middle or latter part of May of each year, and the upper part until about the middle of June, although the irrigating season in that locality extends until September and October of each year. *During all this time, however, plaintiffs claimed the right to and have appropriated and used all the water they could divert to their farm by means of the ditch and dam heretofore described.* The diversion appropriation, and use of all the water that could be taken by plaintiffs and their predecessors in title by their dam and ditch during all the time they have been so using it has never been questioned by the owners of Surveys 656 and 655, or anyone else, *"and plaintiffs and their predecessors in title have since said dam and ditch were first constructed in the spring of 1886 continuously, peaceably, openly, notoriously, and uninterruptedly diverted, appropriated, and used all the water necessary for the irrigation of said farm which could be diverted by said dam and ditch."*

In December, 1920, the plaintiffs filed with the Board of Water Engineers a certified copy of the original appropriation affidavit and map made and filed by J. S. Fowlkes in November, 1889, as well as the affidavit and information with reference to said dam, ditch, and farm, required by the Irrigation Acts of 1913 and 1917—all of which were filed and recorded by the Board of Water Engineers.

The defendants purchased their 160 acres out of Surveys 655 and 656 from R. H. Mitchiner, by deed dated September 13, 1920, and duly filed for record on the same day. None of said land was in cultivation except about twenty acres, and none had been irrigated at the time of their purchase. Prior to the time they bought they examined the land and saw the dam and ditch of the plaintiffs, and knew that plaintiffs were diverting and appropriating and using the water therefrom for irrigating the "Twin Mountain Farm." After they had purchased the land the defendants approached two of the plaintiffs who were living on the farm for the purpose of seeing what agreement could be made to enable the defendants to procure water with which to irrigate the land they had purchased, and were informed they would have to see Charles C. Motl, who lived at Temple, the oldest of the heirs, and who had power of attorney from the other heirs to manage the "Twin Mountain Farm," and with whom any arrangements would have to be made. The defendants were told by said plaintiffs at that time that they did not think there would be any objection to defendants'

raising plaintiffs' dam to such a height as would impound suffi-
cient water for defendants' use.  Defendants did not, however,
see Charles C. Motl, or make any arrangements with any of the
plaintiffs about taking water from the reservoir.

On November 29, 1920, the defendants made an application
to the Board of Water Engineers for a permit to divert water
from the said reservoir above described to irrigate 120 acres
of their lands.  The application was filed by the Board and
hearing had after the notice provided for by the Irrigation Act
of 1917.  The plaintiffs herein, as well as one L. P. Duncan, an
upper riparian owner, and C. A. Probandt, a riparian owner
immediately below the dam, filed a protest with the Board of
Water Engineers to the granting of a permit to defendants,
supporting their protest with affidavits required by law and by
the Board, and appeared by counsel before the Board at the
hearing.  The Board upon hearing the application, the protest
thereto, with affidavits in support thereof, and after considering
the same, denied the application and refused to issue a permit
to the defendants under the then existing circumstances.  The
application for the defendants was made by R. W. Boyd.  In
this he stated that he desired to appropriate 120-acre feet of
water per annum by impounding 832-acre feet, and to divert
"from the reservoir proposed to be created of the unappropriated
*storm waters of the State of Texas* for the purpose of irriga-
tion from the watershed of the Concho River on Spring Creek."
(Italics ours.)  As far as we are able to determine from the
record, the location of the dam described in the application of
Mr. Boyd is the precise location of the dam of plaintiffs, and
we assume that this was the dam referred to in the application.
The description of the dam is also substantially the same,
although in the application it is stated that the dam and work
are proposed to be installed.  The evident purpose was, however,
to use the dam and reservoir of plaintiffs.  It is stated in the
application that the method of diverting the water from the
reservoir is to be by pumping—describing the pumping plant.
The lands to be irrigated are then described, being 120 acres
out of the 160 acres heretofore referred to.  The order of the
Board rejecting the Boyd application, after reciting that the
application was for a permit "to impound, divert, and appro-
priate certain public waters of the State," rejected the same
"under existing circumstances."

It may be noted at this time that the application made by
Mr. Boyd was for the right to appropriate waters from *"the*

*unappropriated storm waters of the State of Texas,"* and *this* was the right denied him by the refusal of the application.

Notwithstanding the facts which we have detailed, and notwithstanding the refusal of the Board to grant the application of Mr. Boyd, the defendants installed an engine and pump on their lands on the north bank of Spring Creek, approximately 150 yards above the defendants' dam, and on May 29, 1921, began pumping water from the defendants' reservoir formed by the dam, and diverted and used the same to irrigate approximately eighty acres of their land, which had been put in cultivation. The defendants were engaged in pumping this water when the temporary writ of injunction was served on them.

When the defendants came to the San Angelo country in August, 1920, prospecting for land, they were shown over the lands purchased by them by Mr. Mitchiner. At that time they saw the dam across the creek and the ditch leading from it, and were told by Mr. Mitchiner that such dam was what was known as the Lackey Dam and Ditch. They made no inquiry of Mr. Mitchiner with respect to the rights of the plaintiffs to the use of the water in the reservoir, nor were they told by Mr. Mitchiner, or anyone else, prior to their purchase of the land, that the plaintiffs, or anyone else, claimed all the water in the reservoir, to the exclusion of its use for irrigation purposes on the lands subsequently purchased by them. The defendants were strangers in the country, had no knowledge, nor were they informed prior to the purchase of the land, that P. C. Lee, predecessor in title of the defendants, had consented that Lackey and Nasworthy might construct the original dam and ditch as heretofore detailed. The defendants purchased their lands for the purpose of clearing and putting them in cultivation and under irrigation, and paid $40. per acre for same. Said land at the time of their purchase, except some twenty acres of dry farming land, was not in cultivation. If this land is not entitled to the use of water for purposes of irrigation, it was worth at the time of their purchase about $15 per acre.

The statement of facts further reads:

"At the time William Lackey and John R. Nasworthy constructed the dam in question, and at no subsequent time, has any compensation ever been paid the owners of Surveys 655 and 656, including the defendants, for whatever water rights inured to the owners of said land by reason of the ownership of said riparian surveys, nor have said rights ever been condemned by the plaintiffs or anyone under whom they claim.

"At the time of the original construction of the ditch and dam, William Lackey and John R. Nasworthy approached one P. C. Lee, who was then the owner and in possession of said Surveys 655 and 656, and requested his permission to erect said original dam and ditch, and the said P. C. Lee verbally consented to the erection of said dam and the construction of said ditch; that no consideration was paid the said P. C. Lee for his consent to the erection of said dam or the construction of said ditch and that the said P. C. Lee required no consideration therefor; that nothing was said at the time about any limitation upon the water rights of the said P. C. Lee, and that the said P. C. Lee never objected during the time he was the owner of said land to the existence of said dam or ditch, or to the use of the water out of the reservoir formed by said dam by the predecessors in title of the plaintiffs, and that no owner of said Surveys Nos. 655 and 656 have since said time, up to the filing of this suit, expressed to the plaintiffs any objections to the continuance of said dam and ditch or to the use by plaintiffs of the water utilized by them by means of said ditch and dam.

"Prior to the time of the construction of said dam and ditch, Spring Creek was a running stream at the point where said dam is located and along and in front of said Surveys Nos. 655 and 656, and that there was prior to the construction of said dam a natural hole or reservoir of water in said creek of varying depth."

It is upon this state of facts that the issues to be determined in this case arise.

### OPINION.

The insistence is strongly made in this case that the doctrine of riparian rights as commonly defined and understood has no application to natural or statutory navigable streams in this State, and that as to such, water for other than domestic, stock, and household uses is to be obtained by statutory appropriation. We are urged to conclude, on authority of statutes enacted from time to time since 1852, the conservation amendment to the Constitution adopted in 1917, and upon cogent reasons deduced from conditions which obtain in this State, to declare that riparian rights do not exist on natural or statutory navigable streams in Texas, and to apply therefore the doctrine of prior appropriation, and decide this case accordingly. This course is insisted on with so much force and so earnestly that we have concluded to investigate the whole subject for the purpose, if we can, of ascertaining the rule applicable in this State, and of

harmonizing our statutes and decisions and setting at rest, in so far as we can, the question involved.

The Mexican colonization law of 1823, enacted by the government of Iturbide, and confirmed by its successor to Stephen F. Austin alone, declared in Art. 2 that its object was to facilitate the colonization of Mexico, and for this purpose it was made the duty of the executive to distribute lands under the conditions and terms expressed in the Act. Art. 6 of that law provided:

"In the distribution made by government, of lands to the colonists, for the formation of villages, towns, cities, and provinces, a distinction shall be made between grazing lands, destined for the raising of stock, and lands suitable for farming or planting, *on account of the facility of irrigation.*" Gammel, Vol. 1, p. 28. (Italics ours.)

It was in conformity with this law that Austin was first authorized to proceed with his colonization plans.

It is obvious from a reading of the article quoted that the Mexican government at that time required Austin by the terms of the Act and decree to make a distinction between land which might be irrigated and that which could not be. This distinction was to be observed in the distribution of the land, making it clearly apparent to us that *"the facility of irrigation"* was to be a part of the thing, that is, the land, granted to the colonists where it existed. Austin's first colony was formed under this act. Sayles' Real Estate Laws, Vol. 1, Art. 67.

On March 18, 1824, the Mexican national government, through its legislative and executive department, enacted a national colonization law, the purpose of which was the colonization of the public lands of the nation, as shown by Sec. 2 of the decree; and for this purpose the lands were placed in the control of the Mexican States. Gammel's Laws, Vol. 1, p. 38; Sayles' Real Estate Laws, Vol. 1, Art. 131. Art. 3 declared:

"For this purpose the legislatures of all the State will, as soon as possible, form colonization laws or regulations by their respective States, conforming themselves in all things to the constitutional act, general constitution, and the regulations established in this law."

This Act contained some limitations on the power of the Mexican States, in the distribution of land to colonists, most of which are unnecessary for us to notice. That contained in Art. 12, however, touches the subject here under examination. This article reads as follows:

"It shall not be permitted to unite in the same hands with

the right of property, more than one league square of land, *suitable for irrigation,* four square leagues in superficies, of arable land without the facilities of irrigation, and six square leagues in superficies of grazing land." Gammel's Laws, Vol 1, p. 39. (Italics ours.)

It is to be noted that this article limited the amount of land which a colonist might acquire *"suitable for irrigation."*

Subsequent to the enactment of this law, and by virtue of its authority, on March 24, 1825, the "sovereign State of *Coahuila and Texas,* desiring by every possible means to augment the population of its territory; promote the cultivation of its fertile lands; the raising and multiplication of stock * * * thought proper to decree" a State colonization law. This act of Coahuila and Texas, which like the national ones which preceded it, became and remained a part of the law of Texas up to its revolution, treated in great detail the subject of colonization. It prescribed such preferences as might be given to colonists, limited to a certain extent the area of colonization, and regulated and defined methods of land measurement. Secs. 12 and 22 of this law read as follows:

"Art. 12. Taking the above unity as a basis, and observing the distinction which must be made between grazing land, or that which is proper for raising of stock, and farming land, with or without the *facility of irrigation;* this law grants to the contractor or contractors, for the establishment of a new settlement, for each hundred families which he may introduce and establish in the State, five sitios of grazing land, and five labors at least, the one-half of which, shall be without the *facility of irrigation,* but they can only receive this premium for eight hundred families, although a greater number should be introduced, and no fraction whatever, less than one hundred, shall entitle them to any premium, not even proportionately."

"Art. 22. The new settlers as an acknowledgment, shall pay to the State, for each sitio of pasture land, thirty dollars; two dollars and a half for each labor without the *facility of irrigation, and three dollars and a half for each one that can be irrigated,* and so on proportionately according to the quantity and quality of the land distributed; but the said payments need not be made, until six years after the settlement, and by thirds; the first within four years, the second within five years, and the last within six years, under the penalty of losing the land, for a failure, in any of said payments; there are excepted from this payment, the contractors, and military, spoken of in the tenth

article; the former, with respect to lands given them, as a premium, and the latter, for those which they obtained, in conformity with their diplomas." Gammel's Laws, Vol. 1, pp. 42 and 43. (Italics ours.)

It is to be observed from Art. 12 that a distinction is made between lands which were irrigable and those which could not be irrigated, both as to amount and price. Under this law Austin's subsequent colonization contracts, as well as those of others, were made. Gammel's Laws, Vol. 1, pp. 47, 49, 51, 52, 53, 54, 55; Sayles, Real Estate Laws, Vol. 1, Arts. 68, 69, 70, 71; Sayles' Real Estate Laws, Vol. 1, Arts. 72 to 93.

On the 28th of April, 1832, the government of Coahuila and Texas repealed the law of March 24, 1825, which we have been discussing, but continued it in effect as to the colonization contracts still in force either at that time or by subsequent decree. Gammel's Laws, Vol. 1, pp. 299, 361, 407; Sayles' Real Estate Laws, Vol. 1, Art. 116; Board of Land Comrs., Dallam, p. 366 (17).

This act is too long to quote in this opinion. It relates to the settlement of vacant lands, and treats the subject of irrigation at length. A difference in price is made between land which is irrigable and not irrigable, and other provisions clearly show that in all grants of land thereunder regard was to be had to the subject of irrigation and to the right to irrigate. Sec. 29 declared that when surveys of vacant lands should be made upon the borders of any river, running rivulet, creek, or lake, it should not exceed one-fourth of the depth of the land granted. Gammel's Laws, Vol. 1, pp. 299, 301.

On March 26, 1834, the government of Coahuila and Texas repealed the Act of 1832, changing entirely the policy of the government as to the sale of vacant lands. This act, however, provided for the strict fulfillment of all land grants under the Colonization Act of 1825. In this Act it was provided that lands fronting on permanent creeks, rivers, etc., should run back double the extent of their front. Gammel's Laws, Vol. 1, p. 357; Sayles' Real Estate Laws, Vol. 1, Art. 121.

By decree of the Central Mexican government of May 2, 1834, the last named Act of Coahuila and Texas was invalidated. Sayles' Real Estate Laws, Vol. 1, Art. 124.

The government of Coahuila and Texas passed various laws touching the subject of irrigation and distribution of waters, other than those which we have mentioned. These laws, however, related principally to municipalities. Gammel's Laws, Vol.

1, pp. 203, 271, 323, 342, 352, 354, 365.  From an examination of such of these Acts as are available, we are led to the conclusion that in actual practice the waters were equitably distributed where touched by irrigable lands, in a manner paralleling more or less the rule of riparian rights.  San Juan Ditch Co. v. Cassin, 141 S. W., 815.

A portion of Texas prior to its independence was within the Mexican State of Tamaulipas.  Sayles' Real Estate Laws, Vol. 1, Arts. 152, 153.

Arts. 15 and 23 of the Colonization Act of Tamaulipas, passed December 15, 1826, contained provisions as to irrigable land, similar to those in the colonization law of Coahuila and Texas, heretofore quoted from.  The price, however, of lands having the benefit of running water was not fixed by the statute, but was to be estimated by certain competent persons.  Gammel's Laws, Vol. 1, pp. 456, 457.

It is too plain for debate that the Mexican government, through the Central Government of Mexico, and through those of Coahuila and Texas and Tamaulipas, was much concerned with, and undertook to regulate to some extent, the subject of irrigation and water rights. It would be unreasonable to say that these governments sold or assigned lands to colonists, charging therefor a different price for irrigable lands to that charged for other lands, limiting the quantity of irrigable lands which might be granted to one person, and providing for surveys to front one-fourth or one-half on the streams, without meaning by such Acts and decrees to give to the land owners rights to use the water for irrigation as well as other purposes.

It is apparent, at least from 1824 on, that it was the policy of the Mexican government to cause its waters to be distributed to its colonists along with its lands, and we have no doubt that the general policy was to grant to its riparian proprietors substantially the same use of the waters that is commonly accorded to them today.  Such seems to be the general conception of the law set forth in Hall's Mexican Law, pp. 411, 418.  In Art. 1388, p. 411, it is said:

"Waters which are not nor cannot be private property belong to the public.  Such were the waters of the rivers which by themselves or by accession with others follow their course to the sea.  These may be navigable or not navigable.  If they are navigable, nobody can avail himself of them so as to hinder or embarrass navigation; but if they are not, the owners of the

land through which they pass may use the waters thereof for the utility of their farms or their industry," etc.

In Art. 1391 the writer says:

"If running water passes between estates of different owners, each one of these can use it for the irrigation of his estate or for any other object, but not the whole of it, but only the part which corresponds to him, because both have equal rights, and the one can consequently oppose the use of it all by the other, or even a part considerably more than his own."

By virtue of the decree of January 4, 1823, of the government of the Emperor Iturbide, by virtue of the confirmation of that law as applicable to Stephen F. Austin's grants, by virtue of the national Colonization Act of August 18, 1824, the colonization law of Coahuila and Texas of March 24, 1825, and subsequent laws to which we have referred, both of Coahuila and Texas and Tamaulipas, relating to the distribution of lands, waters, and irrigation, and in view of what we have cited from Hall's Mexican Law, we believe we are clearly warranted in saying that, in so far as the Mexican law in Texas is concerned, it was one which distinctly recognized the rights of riparian owners of land.

Many millions of acres of land were granted by the governments of Coahuila and Texas and Tamaulipas to colonists under the several laws which we have just described. Sayles' Real Estate Laws, Vol. 1, pp. 100 to 120; Sayles' Early Laws, Vol. 1, p. ix. The laws under which the grants were made were too well known, and the quantity of land too large, for us to assume that the general policy of the government was other than well established and well known to the people of Texas when the independence of the State was established in 1836.

The independence of Texas was declared March 2, 1836. On the 16th of March the Constitution was adopted, and was ratified by the people of the State on the first Monday of September following. In a schedule forming a part of the Constitution, it was provided that all laws then in force in Texas, and not inconsistent with the Constitution, should remain in full force until declared void, repealed, altered, or expired by their own limitation. Sayles' Real Estate Laws of Texas, Vol. 1, p. 20.

With certain exceptions, the principles of the civil law and the laws of Coahuila and Texas, while a Mexican State, prevailed in Texas until the Act of the Republic, January 20, 1840.

On January 20, 1840, the common law of England, in so far as not inconsistent with the Constitution or the Acts of Congress

then in force, was, with such Acts, made the rule of decision, and all laws in force prior to the first of September, 1836, were repealed, "except the laws of the Consultation and Provincial Government now in force, and *except such laws as relate exclusively to grants and colonization of lands in the State of Coahuila and Texas   *   *   *   made by the General and State governments.*"   Gammel's Laws, Vol. 2, pp. 177, 178.   (Italics ours.)

In so far as colonization grants were concerned, this Act of the Republic was a distinct recognition of the laws under which the grants were made, and a declaration by the Republic of Texas that these grants and the rights thereunder would be recognized and carried forward under the laws under which they were made, included in which were, we have seen, the rights of riparian owners.

The colonization grants made under the colonization laws of Mexico and Coahuila and Texas were confirmed from time to time by the Republic of Texas.   This is shown, among other places, in the Act of December 22, 1836, establishing a general land office for the Republic of Texas.   See Sec. 21 of that Act. Sayles' Early Laws, Vol. 1, p. 235.

The Act of December 14, 1837, the purpose of which was to consolidate into one general Act the several Acts relating to the establishment of a land office, clearly recognized the colonization grants made by Coahuila and Texas, and provided that irrigated lands should be surveyed when claims were made by colonists.   See Secs. 10, 12, and 13 of that Act.   Sayles' Early Laws, Vol. 1, pp. 261, 262, 263.

It will be remembered that the Acts of 1832 and 1834 of the State of Coahuila and Texas adopted the policy of limiting the frontage of land grants on rivers and streams.

In an Act supplementary to the original Act establishing a land office for the Republic, passed June 12, 1837, and providing for sectionizing the State, the Congress of the Republic adopted this same policy and provided that all lands surveyed *"lying on water courses shall front one-half of the square on the water,* the line running at right angles with the general course of the stream, and all others not on water courses shall be square," etc. Sayles' Early Laws, Vol. 1, p. 244.   (Italics ours.)

In the subsequent Act of December 14, 1837, above referred to, consolidating the various laws theretofore existing—and as an examination of it shows, making certain additions thereto—Sec. 21 thereof contained a provision the purpose of which was to supersede that just quoted.   This provision reads as follows:

"Sec. 21.   That all lands surveyed, for individuals lying on

navigable water courses shall front one-half of the square on the water course, and the line running at right angles with the general course of the stream, if circumstances of lines previously surveyed under the laws will permit, and all others not on navigable water courses shall be square if lines will permit; and, under no circumstances, shall any one grant be located in more than two surveys."

Sec. 42 of this same Act defines navigable streams as follows:

"Sec. 42.    That all streams of the average width of thirty feet shall be considered navigable streams within the meaning of this Act, so far up as they retain that average width, and that they shall not be crossed by the line of a survey."    Sayles' Early Laws, Vol. 1, pp. 266, 271.

These provisions have been the general law continuously since their enactment in 1837. Revised Statutes, Art. 5302.

The colonization contracts of the Republic of Texas were based on a law passed in 1841, and therefore rights thereunder must be interpreted in the light of the common law, which was adopted as the rule of construction the year previous. A list of the colonization contracts may be found in Sayles' Real Estate Laws, Vol. 1, p. 12. See also Arts. 164 and 165.

Since all land sales subsequent to the adoption of the common law as a rule of construction must be considered in the light of that adoption, we deem it unnecessary to enter into a detailed analysis of the various laws of the State authorizing grants or sales of land. We will direct attention, however, to some of them.

The Legislature of the State, by the Act of July 14, 1877, Special Session Laws, p. 48, made provision for the sale of lands in certain counties of the State. In this Act the frontage on running streams or permanent water was limited. Sayles' Texas Civil Statutes (1897), Vol. 2, pp. 1957, 1958.

By an Act of July 8, 1879, the sale of alternate sections of public land in organized counties was authorized. This Act was amended in 1881, and a minimum price fixed for lands having fresh water on or bordering on them. Sayles' Real Estate Laws, Vol. 1, pp. 335, 339.

In 1881 the Act of 1877 was amended, and the frontage of tracts sold on navigable streams or permanent water was limited. Sayles' Texas Civil Statutes (1897), Vol. 2, p. 1960.

The land board Act of April 12, 1883, required the land board in its classification of lands to ascertain which tracts had permanent water on them or bordering on them, fixing a different price for lands having water to that fixed for other lands.  Acts

of 1883, Chap. 83. The land board in carrying into effect this Act observed a distinction between watered and unwatered lands. Sayles' Early Laws, Vol. 1, Arts. 369, 377, 378, 382, 386, 388, pp. 369, 370, 373, 374, 377, 381, 383, 385.

In 1887 an Act was passed relative to the sale of free school and other public lands. A classification of the lands was provided for, and a minimum price for all lands having permanent water on or bordering on them. Certain other regulations were provided with reference to watered sections. Vernon's Texas Civil Statutes (1914), Vol. 4, p. 4919; Act of 1887, Chapter 19, page 83.

The several Acts to which we have made reference were amended at various times. The Act of 1887, to which we referred, was amended in 1889, 1891, 1893, 1895, and again in 1897.

Under the Act of 1887 those appointed to examine and appraise public lands were required to prepare an accurate plat of each section, showing, among other things, the streams and sources of water supply.

The Acts of 1887 and 1889 clearly made a difference in the prices of watered and unwatered lands. Revised Statutes (1895), Arts. 4283, 4286, 4287, 4289.

It is obvious from the references to the various laws that for a long period of time the statutes made a clear distinction between watered and unwatered lands, and lands bordered by permanent water; and no doubt a large portion of the public domain was sold under these Acts. Since a difference was made in the price and classification between unwatered lands and lands that were watered or bordered by water, it is too clear to admit of debate that the purpose of the State was to sell some type of water right along with the lands. It is true the extent of this water right may have been limited by the irrigation Act of 1889 as to subsequent sales, but there can be no doubt that it was the general policy of the State in the sale of these lands to recognize some type of right in the riparian owner. Of course, that type must be determined by either legislative enactments existing at the time, or the grants as interpreted under the common law, adopted in 1840.

On the whole, it seems obvious to us that under the grants made to colonists by Coahuila and Texas and Tamaulipas, acting under their own legislative acts and the decrees of the Central Mexican Government, there can be no doubt that riparian rights were not only recognized but granted upon consideration to

the colonization grantees. After 1840, under the colonization acts of the Republic of Texas and subsequent acts of the Republic and of the State of Texas, it is clear to us that the rights of owners bordering on streams must be determined in the light of the common law and in the light of legislative enactments. So determined, it is plain, we think, that all grantees of public lands become invested, by reason of the lands granted, with riparian rights to the waters of the streams. On the whole, we think it proper to say that from the Mexican decree of 1823 down to the passage of our appropriation act in 1889, the fixed policy of this State, under all of its several governments—that of Mexico, Coahuila and Texas, Tamaulipas, and the Republic and State of Texas, was to recognize the right of the riparian owner to use water, not only for his domestic and household use, but for irrigation as well.

What we have thus far said has been predicated upon the history of the subject, and an interpretation of the laws, decrees, and acts involved. The construction, however, is in harmony with the decisions of this court, which appear to us to have settled the question that riparian rights to the use of the waters of the streams of the State for irrigation purposes were a part of the grants of land when the grants were made. Watkins Land Co. v. Clements, 98 Texas, 578, 70 L. R. A., 964, 107 Am. St., 653, 86 S. W., 733; Board of Water Engineers v. McKnight, 111 Texas, 82, 229 S. W., 301; Martin v. Burr, 111 Texas, 57, 228 S. W., 543.

The defendants' second, third, fourth, and fifth counter propositions in the Court of Civil Appeals are to the effect that Spring Creek is not a navigable stream, either in fact or law. We cannot assent to this conclusion.

Spring Creek, according to the record, is clearly within the statutory definition of a navigable stream. Art. 5302. The bed of the creek has an average width of more than thirty feet, although the waters flow in an ordinary season over less than thirty feet of this width. A water course, river or stream, consists of a bed, banks, and a stream of water. Kinney on Irrigation, Vol. 1, Sec. 303; Farnham on Waters, Vol. 2, Sec. 417. The bed of a stream is that portion of its soil which is alternately covered and left bare as there may be an increase or diminution in the supply of water, and which is adequate to contain it at its average and mean stage during an entire year, without reference to the extra freshets of the winter or spring or the extreme drouths of the summer or autumn. Alabama v.

Georgia, 23 Howard (U. S.), 505, 16 L. Ed., 566; Oklahoma v. Texas, 260 U. S., 606, 631, 67 L. Ed., 428; Howard v. Ingersoll, 54 U. S. (13 How.), 381, 14 L. Ed., 189. The banks of a stream or river are the water-washed and relatively permanent elevations or aclivities at the outer lines of the river-bed which separate the bed from the adjacent upland, whether valley or hill, and serve to confine the waters within the bed and preserve the course of the river when they rise to the highest point at which they are still confined to a definite channel. Oklahoma v. Texas, 260 U. S., 606, 631, 632, 67 L. Ed., 428; Kinney on Irrigation, Vol. 1, Sec. 305; Farnham on Waters, Vol. 2, Sec. 417. The definitions given are consistent with the Mexican or Spanish law on the subject. Hall's Mexican Law, pp. 416, 418.

Since the stream is a navigable one, the elevations of land adjacent to its bed, which hold its navigable waters in place, and to which boats might be tied or anchored, and wharfs or other instrumentalities of navigation attached are its banks. In other words, the bed of the stream defined by the statute is that portion of the terrain between its fast-land banks. So, when the statute says that the average width shall be thirty feet between the banks, it does not mean the space covered by the water at a low tide or flow, but the entire bed of the stream as above defined. The fact that at times and places there may be some distance between the bordering banks which limit the survey lines, and the water does not militate against the right of the riparian owner to have access to the water. When the riparian rights were granted, they carried therewith the right to use the water, and this is adequate to give access to it at all stages. Oklahoma v. Texas, 260 U. S., 606, 632, 67 L. Ed., 428; Kinney on Irrigation, Vol. 1, Sec. 469.

Prior to 1837 the Mexican colonization laws limited the frontage of grants on streams of the State, as we have seen. The purpose of this was plainly to make the waters serve as many people as possible. In other words, it was a method of dividing the waters coincident with granting the land. With this principle the people of Texas were familiar, and it no doubt entered into the minds of the Congress of the Republic, which passed the Act of 1837, limiting the frontage of grants on rivers and streams. Congress, however, confined the limitation to navigable streams, and defined these streams as now appears in Revised Statutes, Art. 5302. In thus defining navigable streams by statute, Congress was exercising a valid and familiar legislative right and power. 27 Ruling Case Law, p. 1307, Sec. 216.

In 1837 the known and inhabited portion of the State was

largely confined to the territory between the Gulf of Mexico on the south, Red River on the north, and the Balcones fault line and escarpments on the west or northwest. In this territory the streams are fluvial due either to the abundant rainfall of eastern Texas and the coastal plain, or the great springs of the Balcones fault, which supplies such streams as the Gaudalupe, San Antonio, and San Marcos Rivers. The dominating streams of the State, such as the Brazos, Trinity, Colorado, Rio Grande, Red River, and others, all flow through this territory and were capable of being navigated. In fact, some of them, like Red River, were navigated until the coming of the railroads after 1870. Besides, all streams in this territory, within the statutory definition, were at least floatable, a species of navigation of very great importance, particularly in the lumber section of the State.

When this Act was passed, navigation was apparently the only practicable means of transportation, and various other navigation acts were passed before and after the Act of 1837. Gammel's Laws, Vol. 1, pp. 210, 402, Vol. 3, pp. 66, 155, 1305. As late as 1876 canals thirty feet wide were regarded as so valuable for navigation that land grants were made to those who would construct such navigable canals. Revised Statutes (1879), p. 435.

In 1853 an Act was passed making appropriations for the improvement of the rivers of the State. Among those named are the Sabine, Trinity, Brazos, Little River, Colorado, Neches, Angelina, Guadalupe, San Antonio, Cypress Bayou, Little Cypress, Sulphur Fork of Red River, Buffalo Bayou, San Jacinto River, San Bernard, Lavaca, Nueces, and the Navidad. Gammel's Laws, Vol. 3, p. 1305.

At an early day the Legislature made it an offense to obstruct the navigation of any stream capable of being navigated by either steam, *keel*, or *flat boats*. Paschall's Laws of Texas, Vol. 1, Art. 2089; Selman v. Wolf, 27 Texas, 68. These several Acts show not only the importance of navigation, but that streams capable of floating keel or flat boats, whether declared navigable or not, were protected from obstruction. From a review of the history of the matter and the conditions then obtaining, we are convinced that Congress in passing the Act of 1837 was actuated by two motives: (1) A division of the waters by limiting the frontage on streams; and (2), reservation of navigable rights on all streams which were capable of

or thought to be capable of being made navigable by instrumentalities of navigation then in current use.

We therefore conclude that Spring Creek is a public navigable stream under the statute, and that the title to its waters is in the State in trust for the public. Landry v. Robison, 110 Texas, 295, 219 S. W., 819; City of Austin v. Hall, 93 Texas, 591, 598, 57 S. W., 563; State v. Sunapee Dam. Co., 70 N. H., 458, 59 L. R. A., 55, 61; Walbridge v. Robinson, 22 Idaho, 236, 43 L. R. A. (N. S.), 240; St. Anthony Falls W. P. Co. v. Board of Water Com., 168 U. S., 349, 42 L. Ed., 497; Home etc. v. Commonwealth, 202 Mass., 422, 24 L. R. A. (N. S.), 79, 82; Rundle v. Canal Co., 14 How. (U. S.), 80, 14 L. Ed., 335. The waters are in trust for the public: First, for navigation purposes, which concerns all the public and is ordinarily regarded as a superior right; second, the riparian waters of the stream are held in trust by the State for the riparian owners along its margins; third, the nonriparian waters in the stream are held by the State in trust, to be controlled and disposed of by the State for the best interests of all the people; fourth, the waters are in trust for uses and benefits not here involved.

It now becomes necessary to determine what are the riparian and nonriparian waters of Spring Creek.

We are of the opinion that riparian waters are the waters of the ordinary flow and underflow of the stream; and that the waters of the stream, when they rise above the line of highest ordinary flow, are to be regarded as flood waters or waters to which riparian rights do not attach. Our reasons for this conclusion will now be stated.

The underflow of streams is not here involved, and will not be further discussed except in an incidental way.

"The line of highest ordinary flow" is the highest line of flow which the stream reaches and maintains for a sufficient length of time to become characteristic when its waters are in their ordinary, normal and usual condition, uninfluenced by recent rainfall or surface run-off.

The streams of Texas, being those waters to which our laws and this opinion construing them must apply, in general have certain characteristics which must be observed in determining the rights of the people thereto. The things to be ascertained here are the rights granted riparians when the lands were granted to them, considering the duty which the State at the time owed, and since owes, all citizens in virtue of the rights granted *them,* and in virtue of the duty of the State to exercise

its police power, as commonly understood and made necessary by the physical aspects of the territory to be governed.

Considering the territory of Texas in its physiographic aspects, it may be said that it consists of a series of belted plains, sloping in general at the rate of some six or seven feet per mile, from an altitude of 4,000 feet on the high plains on the line of New Mexico and Texas to zero at the Gulf coast line. Beginning with the Gulf coast line is a plain, or series of low plains, commonly called the Coastal Plain. It will be found by looking at the map that the low coastal plain, extending back from sixty to ninety miles from the Gulf, has a series of streams or rivers which originate within that plain and empty into the Gulf of Mexico. Between the northern boundary of this plain and what is commonly called the Balcones fault line, is found a higher plain, upon which rises another series of rivers and streams, some of which, however, rise on the higher ground north of the Balcones fault line, but which pass down to the lower coastal plain into the Gulf. Ascending the considerable elevation usually found along the Balcones fault line, in general terms another plain is reached. Upon this plain, as shown by the map, various streams originate and pass through the other belts of territory named to the Gulf of Mexico. Still going farther in a northerly or westerly direction is found a high territory lying east of the breaks of the plains, upon which will be found the head-waters of various streams, some of them of great magnitude before they reach the sea. Going still farther west we ascend the east facing escarpments of the plains or high plains section, upon which, either in Texas or New Mexico, are found the head-waters of the long and more important rivers of the State, included in which may be named, the Pecos, the Colorado, the Brazos, the Red River, and the Canadian. The Rio Grande, of course, passes out of Texas above El Paso on through New Mexico, and rises in the Rocky Mountains. See generally Geological Map of Texas (ed. 1919) by University of Texas Bureau of Economic Geology; Hill's Physical Geography of the Texas Region, and map issued by the United States Geological Survey.

The streams of the State assume characteristics due to the meteorological conditions over their water-sheds, the physiographic features which they encounter, the sylvan and vegetal life and the geological formations through which they pass. The result of these conditions, including lack of forest control of the run-off, has been that severe and destructive floods are

characteristic of the streams of this State. One cannot in the compass of an opinion discuss the conditions which give rise to the floods, but there are various scientific works available which show that the characteristics of the streams of Texas are not the same as those of any other territory of the same size, and that they arise out of the peculiar conditions which obtain in the State. See the sources of information just cited, and in addition United States Geological Survey Supply Papers Nos. 388, 408, 438, 478, 488, 508, 548, 458; House Document 304, Report of the U. S. Board of Engineers on the Colorado River.

It is quite unnecessary to discuss at great length the subject of flood damage in Texas. Every community east of the breaks of the plains, and many west, has its own story to tell. We think it a matter of common knowledge that every stream of any size east of the ninety-eighth meridian is a flood-making stream, the valleys of which are constantly and persistently inundated. Illustrative of the Texas type of flood is that of Little River in Central Texas in the 1921 flood. This stream has a length of 237 miles from its head-waters to Cameron, with a drainage area of about 7,000 square miles, and a slope of about 5.52 feet per mile. During this flood the maximum discharge at Cameron was *647,000 cubic feet of water per second.* United States' Geological Survey Water Supply Paper No. 488, pp. 18, 19. Some idea of the vastness of this discharge will be gained by noting that it is approximately one-third of that of the Mississippi River at flood stage. This flood was more or less general over central Texas, caused a loss of 224 lives, and destroyed or damaged property amounting to ten millions of dollars. Water Supply Paper, supra. In 1913 there was a destructive flood, measurably over this same area, which caused the loss of 177 lives and destroyed property valued at more than $8,500,000.

The authority referred to states that the average annual losses in Texas by floods amount to several million dollars. Mr. Ellsworth says:

"The average annual losses in Texas by floods amount to several million dollars, and the people of the State are beginning to realize that its future prosperity must depend in large measure upon the wisdom with which they can control and utilize the streams. Over 30,000,000 acre-feet of water annually passes unutilized from the streams of Texas to the Gulf of Mexico, much of it in floods that cause great destruction. Good business sense demands that the floods of Texas be controlled

and that the flood water be stored, so far as practicable, for the many uses for which it is needed." Water Supply Paper No. 488, page 2.

In 1923 the meteorologist for the United States Department of Agriculture made from his record a summary of flood damage in Texas from 1913 to 1922, which is on file with the Board of Water Engineers. This estimate by years is as follows:

| Year | Estimates of damages. |
|------|------------------------|
| 1913 | $ 9,658,770 |
| 1914 | 1,992,000 |
| 1915 | 2,354,000 |
| 1916 | 442,712 |
| 1917 | 100,000 |
| 1918 | 143,000 |
| 1919 | 2,908,000 |
| 1920 | 2,308,200 |
| 1921 | 19,286,450 |
| 1922 | 7,781,875 |
| | $46,975,007 |

The total for the ten-year period is $46,975,007, or an average for each year of $4,697,500.

In addition to what has just been said, we may say that in some of the great floods of the State, great rivers, like the Brazos and the Colorado, the channels of which are located many miles apart, join and become one great moving sea, devastating thousands upon thousands of acres of land and destroying millions of dollars worth of property.

It follows, we think, that the same general right which a riparian owner may have in a well regulated stream of constant flow, such as may be found in England or on the Atlantic seaboard, where the rainfall is seasonal and constant, and the run-off controlled by lakes, physiographic features, or sylvan and vegetal growth, or on a purely mountain stream that flows in deeply incised canyons or through mountain walls, is necessarily a different thing to the rights of a riparian owner on a Texas stream, where sudden freshets and storms may change a peaceful and valuable river into a raging torrent, carrying destruction in its wake. What is therefore declaratory of riparian rights on constant streams of a type normal to a well regulated stream, such as may be found, as we have stated, in

other States, has but little value and no controlling force here. We apply the common law to our conditions when our conditions are similar to those out of which the common law arose, but when the common law is not applicable, because of different conditions, we do not apply it. Kinney on Irrigation, Vol. 1, Secs. 509, 510, and cases cited in the notes; Mud Creek Irr. Co. v. Vivian, 74 Texas, 170, 173, 11 S. W., 1078.

So, we say, in determining the right granted riparians when the land grants were made, we must consider the correlative rights of other riparians and those of the public generally to have their property and lives protected from overflows and floods, for that, too, is a right granted or accorded them when their lands were patented, or when they became citizens. It is absurd to say that a riparian owner has a vested right in the flood waters, or waters which in the ordinary and usual course may become flood waters, carrying destruction in their wake. In the nature of things, one cannot, under our form of government, be accorded a vested right in a natural agency which is destructive of the property and rights of others. We think flood waters are to be treated as a common enemy, the control and suppression of which is a public right and duty. McCoy v. Board of Directors, 95 Ark., 345, 29 L. R. A. (N. S.), 396, 399, 400; Kansas City-M. & B. R. Co. v. Smith, 72 Miss., 677, 27 L. R. A., 762, 48 Am. St., 579. Under the common law as now administered, a riparian use must be a reasonable one (Long on Irrigation, Sec. 56), and certainly no right of use which would constitute a cause of general destruction by floods is a reasonable use. A use which works substantial injury to the common right as between riparians is an unreasonable use (Long on Irrigation, Sec. 56, p. 106), and certainly a use which would injure the general public by permitting overflows and floods is an unreasonable one. The protection of the public against floods by levees and storage reservoirs by the State and its agencies is of ancient origin, universal in its extent, and a practice of modern times. The principle and practice not only finds expression in our statutes, but in the various States of the United States. Not only is it recognized by our statutes, but two departments of the government, the Reclamation Department and the Board of Water Engineers, are directly concerned with it, and vast sums of public money have been appropriated for the purpose. Not only is it authorized under the police power inherent in the State as a government, but the principle finds expression first in our Constitution by the amendment of

1904, and again, in broad, comprehensive, and emphatic terms, in the conservation amendment to the Constitution adopted in 1917. In fact, it is not debatable that it is the duty of the State to control the flood waters of the State. Since the power to control exists, and has existed from the inception of the government, it carries with it the usual established and well recognized methods of control. One is *drainage*, by which overflow conditions are *ameliorated;* another is *levees*, by which given areas are *protected* from floods; and the third is *storage reservoirs or retarding basins* for impounding flood waters, controlling the streams and *preventing floods*. Each of these remedies has been long provided for by our Constitution and Statutes. Constitution, Art. 3, Sec. 52; Art. 16, Sec. 59; Revised Statutes (1895), p. 349; Gammel's Laws, Vol. 10, pp. 1120, 1149; Revised Statutes (1911), Vol. 2, p. 1163; Vernon's Sayles' Civil Statutes (1914), Vol. 4, Arts. 5529a et seq.; Vernon's Complete Texas Statutes (1920), Arts. 2511, 2541, to 2566; Acts 1915, p. 146; Acts 1918 (4 S. S.), p. 97; see also the various irrigation statutes to be hereafter cited. Each of these methods is of ancient origin, scientific in principle, recognized by our statutes, and we believe by the common law. Humphrey's Floods and Levees of the Mississippi, p. 16; Regulation of Rivers, by Van Ornum, Sec. 18, p. 56, p. 307, Sec. 78 to Sec. 82; Report of the Pittsburg Flood Commission (1911), Chaps. 1 and 5; Improvement of Rivers, by Thomas and Watt, part 1, Chap. 7; The Encyclopedia Americana, Vol. 10, Subject, Lake Moeris of Egypt; Law of Waters, by Coulson & Forbes (14th Ed.), Chap. 10; 9 Ruling Case Law, p. 619, Secs. 4, 5; p. 624, Secs. 10, 11; p. 626, Sec. 12; Farnham on Waters, Vol. 2, Sec. 170.

Mr. Ellsworth, of the United States Geological Survey, in Water Supply Paper No. 488, treating of floods in central Texas, says, as we have quoted, that over 30,000,000 acre-feet of water annually pass unutilized from the streams of Texas to the Gulf of Mexico, much of it in floods that cause great destruction. To deny that the State of Texas has power and authority to ameliorate this condition, and to cause the storing of these floods waters, both for the protection of the people and for the reclamation and development of its lands by irrigation, is to deny to the State one of the ancient rights of the police power. On the question of the control of floods by irrigation, Mr. Kinney, in Vol. 1, Sec. 11, of his work says:

"In a recent bulletin, published by the United States Government, it is stated that the damage from floods in the United

States probably exceeds on the average $100,000,000 annually, and in the year 1908, according to estimates based on reliable data, the aggregate damage approximated $250,000,000. 'Such an annual tax on the property of great regions should be reduced in the orderly progress of government.'

＊　　＊　　＊　　＊　　＊　　＊

"By practicing irrigation, man is, in a way, an imitator of Nature. This is accomplished in two ways: First, by taking out the flood water directly from the rivers or their tributaries; second, by constructing great artificial reservoirs wherein the flood water is stored for a time. This water in either case is spread out over vast areas of land through a network of ditches on the upper drainage basins of the rivers and used for irrigation, and, after having accomplished its main object in fertilizing crops, gradually infiltrates back into the streams, at the times when the main flood has passed, and thus insures a regular flow in the rivers below. These lands upon which the water is spread absorb it like a sponge and very slowly give it out by the process of seepage and percolation into the tributary streams of the great rivers. By this means floods may be prevented and at the same time insure a larger flow in the rivers during the dry seasons.

"Practically all of the water withdrawn from the streams and used in irrigation — except that which is absorbed by vegetation, and that which is carried off by evaporation— is finally restored to the river below either by superficial flow or infiltration. This restoration is not immediate and it may take more than one season or even years for the water to find its way into the river below, but it eventually gets there. Hence a stream on the upper headwaters of a river may be entirely diverted and applied to irrigation during the summer months; this would have almost an immediate effect to lower the flow in the river, at least until the seepage began to get through. Therefore the diversion of water during any other period of the year than that of flood water might be an almost immediate injury to the industries on the river below depending upon the water supply in the river. Upon the other hand, the diversion and storage of the waters of a river, or its tributaries, during the high water or flood season, has exactly the reverse effect. It tends to prevent the floods in the lower reaches of the river at times of high water; and, afterwards,

lets it down during the period of low water, and thereby maintains a more equable flow in the river."

That flood waters are not riparian waters, we think substantially supported by the authorities which have had occasion to directly pass upon the question, particularly in those jurisdictions where irrigation is necessary and where the stream type may be regarded as measurably similar, at least in essential respects, to that of the dominating streams in this State. Crawford Co. v. Hathaway, 67 Neb., 325, 108 Am. St., 647, 60 L. R. A., 889, 909; Gallatin v. Corning Irr. Co., 163 Cal., 405, Ann. Cases, 1914a, p. 74; Eastern Oregon Land Co. v. Willow River Land & Irr. Co., 187 Fed., 466; Edgar v. Stephenson, 70 Cal., 286, 11 Pac., 704; Fifield v. Spring Valley Waterworks, 130 Cal., 552, 62 Pac., 1054; San Joaquin, etc. Canal Co. v. Fresno Flume & Irr. Co., 158 Cal., 626, 35 L. R. A. (N. S.), 832, 835; Modoc Land, etc. Co. v. Booth, 102 Cal., 151, 36 Pac., 437.

From a careful examination of the authorities cited, we have concluded that the real basis for the conclusions stated in them is that riparian rights do not attach to the flow of a stream above its normal and ordinary stage. It is true that the courts have sometimes placed their opinions upon findings that in a particular case no harm was done the riparian by the appropriation of flood waters. While this qualification detracts from the weight which is to be given such authorities, in view of the well known and generally accepted fact that flood waters are injurious to the general public, as well as to riparian owners, we conclude that the cases in the main support our announcement that riparian rights attach only to the normal and ordinary flow of the stream as we have defined the normal and ordinary flow.

The construction and limitation which we give the doctrine of riparian rights in this State, under the conditions which are peculiar to us, is consistent with the legislative policy of the State covering a long period of time, and with the express declarations of the conservation amendment to the Constitution of the State.

The Act of 1889 declared the *unappropriated waters* of the streams in the arid portions of the State to be the property of the public, to be acquired by appropriation for the uses named in the Act. 9 Gammel's Laws, 1128. No definition of unappropriated waters appears in this measure, but it is obvious that it could not apply to waters granted to riparians by virtue of their

grants, except, of course, so much of the waters as are not necessary for riparian uses.

The Act of 1895 is more definite, and may be looked to in determining not only its own meaning, but the meaning of the previous Act as well. This Act plainly divided the waters of the rivers of the State into two classes: First, "the unappropriated waters of the ordinary flow or underflow of every running or flowing river or natural stream;" and, second, "the storm or rain waters of every river or natural stream * * * within the arid portions of the State." These two classes of waters were declared to be the property of the State. The third class, and of course that to which the Act did not apply— or, rather, which could not be appropriated under the Act, was riparian water necessary for the use of riparian owners, and any water which may have been appropriated by a water user under the Act of 1889. One section of this Act states that the storm or rainwaters might be stored in dams, lakes, and reservoirs, and be diverted for the beneficial purposes therein named. In a separate section it was provided that the ordinary flow or underflow of the waters of the State might also be diverted, provided this was not done to the prejudice of the rights of the riparian owner. This Act plainly and specifically regards the rights of the riparian owner as attaching only to the ordinary flow or underflow of the streams of the State, and as plainly provides that his rights do not attach to the storm or flood waters of the natural streams of the State. We think, in view of the enactment of this statute on the same subject as that of 1889, within some five years thereafter, it likewise shows that the Act of 1889 was intended to govern the same subject-matter in this respect as the Act of 1895.

In 1904 a constitutional amendment was adopted, permitting the improvement of rivers and streams to prevent overflow, and to permit irrigation and navigation. This amendment was plainly pari materi with the Act of 1895, and is, we think, an adoption by the people of the construction given the doctrine of riparian rights by the Act of 1895. The Act of 1895 had, as we have stated, plainly defined riparian rights as those which attached to the ordinary flow and underflow of the streams, and had as clearly declared that flood and storm waters were subject to legislative control and appropriation in derogation of the rights of any riparian thereto.

The Act of 1895 had been in effect and practical operation in this State for a period of about nine years when the constitu-

tional amendment was adopted, and we must ascribe to the Legislature which submitted it, and to the people who voted to adopt it, a knowledge of the then existing law and the purpose to provide a method by the issuance of bonds for making more effective the provisions of this law and such amendments thereof as might be enacted.

The Act of 1895 was carried forward into the Revised Statutes of that year, and into the revision of 1911. In the year following the adoption of the constitutional amendment in 1904, referred to, the Legislature passed a General Irrigation Act, providing for the creation of irrigation districts. The previous Appropriation Act of 1895 was not in any way modified or amended, but remained the basic law determinative of the rights of riparians and others to the waters of the streams of the State.

It is obvious, we think, that the adoption of the Irrigation District Act, without in any way amending the Act of 1895, was an approval of that Act. In fact, the Irrigation Act itself must be regarded as simply one of the methods for making effective the constitutional amendment of 1904 and the Irrigation Act of 1895. The Irrigation Act may be found in Revised Statutes of 1911, p. 1050.

The Act of 1895 and the Irrigation District Act of 1905 remained on the statutes of this State until 1913, when new and comprehensive measures were passed, the effect of which was to amend and make additions to the previously existing laws. At the time the Acts of 1913 were passed, the Act of 1895, which embraced the same principles as here involved, and as that of 1889, had been in force in this State for eighteen years. The first of these measures, the general water right law, reaffirmed the declarations of the law of 1895, and again made a distinction between the waters of the ordinary flow and underflow of the streams of the State and the storm or flood waters. It declared that "the unappropriated waters of the ordinary flow and underflow," etc., of the streams of the State, and "of the storm, flood or rain waters" which had not theretofore passed from the State, were the property of the State, to be acquired by appropriation under the Act. In a separate section it was provided that the storm, flood, or rain waters might be stored and applied to the beneficial uses prescribed in the Act. In another section it was provided that the ordinary flow and underflow of the waters of the State might be diverted from the natural channels of the streams, provided the diversion would not prejudice the rights of the riparian owners.

At the same session of the Legislature an irrigation district statute, comprehensive in terms, was passed, having for its pur-

pose to take the place of previous irrigation district laws passed in 1905.  This statute is, of course, harmonious with the general laws with reference to water rights to which we have referred. The general Act of 1913 created the Board of Water Engineers, and prescribed their duties with reference to the division of the waters and appropriations thereof.  This Act was careful to declare that nothing therein should affect vested rights existing when it went into effect.  It also declared that nothing in the Act should be construed as a recognition of riparian rights to lands the titles to which had passed out of the State subsequent to the enactment of the Appropriation Act of 1895.

In 1917 another general water right law was passed, having for its purpose to take the place of the Act of 1913.  In so far as the subject here under examination is concerned, it was similar to the Act of 1913.

At this same session of the Legislature a constitutional amendment was submitted to the people of the State, and subsequently adopted by them, known as the Conservation Amendment, which is now Sec. 59 of Art. 16 of the State Constitution.  Subdivision "a" of the Conservation Amendment to the Constitution reads as follows:

"The conservation and development of all the natural resources of this State, including the control, storing, preservation and distribution of its storm and flood waters, the waters of its rivers and streams, for irrigation, power and all other useful purposes, the reclamation and irrigation of its arid, semi-arid and other lands needing irrigation, the reclamation and drainage of its overflowed lands, and other lands needing drainage, the conservation and development of its forests, water and hydroelectric power, the navigation of its inland and coastal waters, and the preservation and conservation of all such natural resources of the State are each and all hereby declared public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto."

It is obvious from a reading of this provision that the people in adopting it have made the precise distinction between storm and flood waters and the ordinary waters of the streams of the State which had been made in 1895 and all legislation subsequent thereto, and which we believe was embraced in the Act of 1889.  It is noted that the amendment, after declaring that the conservation and development of the natural resources of the State were public rights and duties, included within these resources the waters of the State, dividing them, however, plainly into two classes:  First, "its storm and flood waters"; and, sec-

ond, "the waters of its rivers and streams." The phrase "its storm and flood waters" as used in this amendment is not to be construed as applying to waters which flow on the ordinary superficial surface of the land, for these waters, until they reach the natural streamways, are, and have always been, the property of the person on whose lands they fall. 27 Ruling Case Law, pp. 1137, 1138, Secs. 68, 69; Farnham on Waters, Vol. 3, Sec. 883. The phrase, therefore, means the storm and flood waters, in which the State, by virtue of its existence as a State, has an interest, and the use of which it has a right to direct; and the phrase "the waters of its rivers and streams" refers to the waters of the ordinary flow of its rivers and streams, as distinguished from the storm and flood waters thereof.

From what we have previouly said it is plain, we think, that the Legislature in adopting the many Acts affecting water rights, from 1889 down to the present time, has made a distinction between the waters of the ordinary flow and underflow of our streams and the storm and flood waters, and that to the latter riparian rights do not attach. We think it plain, too, that the amendments to the Constitution, adopted after the enactment of these statutes, one of them, the conservation amendment, plainly making the distinction referred to, adopted the construction of the statutes which we have given, and the conclusion at which we have arrived, that riparian rights attach only to the ordinary and normal flow of the streams of the State, included in which are all waters, regardless of source, which do not rise above the line of highest ordinary and normal flow; and that such rights do not attach to the waters of the streams of the State when these waters rise above the highest line of ordinary normal flow. The rights of riparians cannot attach to any waters in a stream above the line of highest normal flow, for the reason that above this point the waters become either dangerous to the immediate locality or to some other locality when they may be joined by other waters, and therefore subject to control by the State, for the purpose of preventing overflows and the devastation which may be caused thereby. In other words, the only way to make effective flood control is to begin to control the waters at the first or incipient danger point. It is true that in one locality on a stream there may be no danger to that immediate locality, by reason of the fact that the waters of the stream have risen a few inches or several feet above the line of highest normal flow, but farther on down the stream, when these excess waters have been joined by those of lateral streams, they may become a part of a flood which

devastates and destroys. Therefore, effective regulation and control of the stream, for the prevention of floods, must begin when the waters of the stream reach the point above defined, and all waters of a stream above the highest line of normal flow as we have defined that line are to be regarded and treated as storm and flood waters. The construction, therefore, which we have given the statutes is one consistent with the effective control of floods, and one absolutely essential if flood prevention and control is to be successfully carried out along the rivers of this State.

If we say that the riparian owner has the right to have the stream flow past his lands above the highest normal flow, or when it is in floodtide, because it may not injure him or others in his immediate locality, and because in sporadic instances someone might be benefited thereby, we have effectually denied the right of the State to reclaim overflowed lands and prevent floods. It would be idle to say that the right of the State to prevent overflows can only begin when the stream itself is in floodtide, for when it reaches that stage overflows cannot be prevented, though there might be protection against them locally by means of levees of a more or less unstable character. Flood waters are all waters which may contribute to an overflow or flood; and all waters above the highest normal flow of the stream are potentially flood waters, and we believe subject to regulation and control by the State, regardless of the riparian's land which may border upon the stream. If we say that the riparian has a vested right in the flood waters of a stream, then we effectually deny the right of the State to control the floods, a holding which would for all practical purposes invalidate the conservation amendment and all our irriagtion and reclamation statutes. On the other hand, if we should base our conclusion on the principle announced in some of the California cases, that flood waters may be appropriated because they are of no benefit to the riparian owner, we are still upon firm ground, for it is a matter of common knowledge, about which there can be no debate, that the flood waters of this State are not only of no value to the riparian owners, but are actually detrimental to them. This, of course, was known to the Legislature when the various Acts to which we have referred were adopted, and to the people when they adopted the constitutional amendments we have described. Of course, there might be sporadic instances where flood waters were of some type of value to the riparian, or there might be sporadic instances where he could utilize flood waters for some purposes, but we have heard of none such, and since the Legis-

lature in enacting laws, and the people in adopting constitutional amendments, must do so with reference to general conditions, we have concluded that, even upon the ground named by the California courts (to which, however, we have not limited this opinion), our conclusion herein as to riparian rights and their limits would be sustainable.

We conclude, therefore, that our appropriation acts, beginning with that of 1889, and down to and including the Act of 1917, the ones here involved, in so far as they authorized the appropriation of storm and flood waters, that is waters above the highest line of ordinary normal flow of the navigable streams of this State as defined in this opinion, and in so far as they authorized the appropriation of other waters without violation of riparian rights, were and are valid and constitutional. Kinney on Irrigation, Vol. 2, Sec. 659; 27 Ruling Case Law, p. 1261, Sec. 171.

The present action, in view of our conclusions above stated, involves only the riparian rights of the defendants. They claim the right to use the waters of Spring Creek as riparians, and not as statutory appropriators, because they have no permit and have made no appropriation. Since we have concluded that the rights of the riparians attach only to the ordinary flow of the stream, under the law in force at the time of the Acts here discussed, no appropriation was necessary in order for them to assert such rights as they had as riparian owners. As riparians, therefore, they were not concluded because they made application for a permit to the Board of Water Engineers; nor did they apply to the Board for permission to appropriate their own riparian water. The record shows they applied to the Board for a permit to appropriate 120 acre-feet of *"the unappropriated storm waters of the State of Texas."* It was a permit for this purpose which was denied them, and under our construction of the law that refusal is not involved in this case. The Court of Civil Appeals, however, considered the question, and held those portions of the statute providing for the issuance of permits by the Board of Water Engineers void. This makes it necessary, in view of the importance of the subject, for us to pass upon the question. The court held that the duties required of the Board of Water Engineers by the statute with reference to issuance of permits were judicial, and therefore void under decision of this court in the case of Board of Water Engineers v. McKnight, 111 Texas, 82 229 S. W., 301, although the same sections of the law were not involved. We do not agree with this conclusion. The Act of 1917, Chap. 8, was and is the law

here involved. In the McKnight case those portions of the statute, Secs. 105 to 132, attempting to confer upon the Board of Water Engineers authority to adjudicate vested rights, and to give the same effect when not appealed from to the courts, and providing that the Board's adjudication should be in effect until determined by the courts were under review, and it was this power which this court denied could be constitutionally conferred upon an administrative agency. No question touching the present issues was determined in that case. The statutes involved in the present case are mere administrative statutes, by which a license is granted or refused, and nothing adjudicated. Sec. 44 of Chap. 88 declares that a water right obtained under the statute is simply the right to use the water of the State for the purposes specified in the Act and in the quantity stated in the permit. The right to use the water is limited for the beneficial purposes specified in Secs. 4 and 9 of Chap. 88, referred to. The license or permit is subject to forfeiture for abandonment, and the water formerly within the terms of the appropriation may be re-appropriated. Secs. 45, 46. Since the use of the water is restricted by the very terms of the statute, it is obvious that a misuse of the water would subject the license to forfeiture. It is entirely clear that no property right is acquired in the water; that what the State does is merely to license the appropriator to use it for statutory purposes in a certain quantity. It is true that Sec. 58 declares that a permanent water right shall be an easement to the land and pass with the title. However, this same section has read into it the purposes for which the water may be used under the statute, and the rights of forfeiture, which we have previously referred to. However, the Board of Water Engineers are not authorized to grant any "permanent water right" such as is described in Sec. 58. It takes three years' limitation to establish the title to an appropriation of water under permits issued by the Board, as against other claimants on the stream. This is shown by Sec. 83. In other words, the grant of a license or permit by the Board to appropriate water concludes nobody's rights, and all who think they are aggrieved by such action have three years within which to file suit against the permitee or person taking water thereunder.

The instrument issued by the Board is called by the statute in various sections a permit—that is, a permit to appropriate water. Permit is snynonymous with leave or license, and means no more than that the party has the license of the State to

become an appropriator of water upon statutory conditions. See generally Words & Phrases, Vol. 6, p. 5317, and Words & Phrases, Second Series, Vol. 3, pp. 974, 977; 17 Ruling Case Law, p. 474.

The right to appropriate does not mature until the permit holder actually appropriates it in the manner and form prescribed by the statute. Sec. 6 of the Act declares "no appropriation of water shall be considered as having been perfected unless such water has been beneficially used for one or more of the purposes named in this Act and for the purpose or purposes stated in the original declaration of the intention to appropriate such water, or stated in the permit issued by the Board of Water Engineers." On the whole, we think the permit is just what the name signifies—merely a license to become an appropriator of public water. Wells on Water Rights, Vol. 1, Secs. 286, 417. Rundle v. Canal Co., 14 Howard (U. S.), 80, 14 L. Ed., 335.

Sec. 24 states it shall be the duty of the Board to reject all applications and refuse to issue the permit asked for if there is no unappropriated water in the source of supply, or if the proposed use conflicts with existing water rights, or is detrimental to the public welfare. If the proposed appropriation is for uses permitted by the statute, and there is unappropriated water, and it does not impair existing water rights or vested riparian rights, and is not detrimental to the public, then the permit may be granted.

If the permit is rejected, no appeal is provided for in the statute to any court. In that respect the statute is precisely like the various statutes of the State authorizing officers to approve or reject in their administrative capacity applications for license. The remedy for refusal would be the same as in other instances where officers fail to perform their ministerial duties.

Manifestly the determination of the subjects required in Sec. 24 is the mere performance of an administrative duty. It is the duty of the Board to reject applications where there is no unappropriated water in the source of supply. The facts as to that question can be determined by the Board by the mere matter of adding up the amount of water previously appropriated and shown on their records, and subtracting it from the amount of State water which they had previously determined the stream furnished. That is clearly administrative.

It is made the duty of the Board to reject the application "if

the proposed use conflicts with existing water rights." This confers no authority on the Board to pass upon the validity of existing water rights. Taken in connection with the require- · ments of notice and the right of persons to appear, it merely means that if under the facts as presented to the Board there is a conflict of interests, it is the duty of the Board to reject the application. There is nothing in the statute which makes the conclusion of the Board that the permit applied for would or would not impair existing water rights conclusive or binding on anyone.

We conclude, therefore, that those sections of the Act of 1917, providing for the issuance of permits to appropriate waters subject to appropriation, are valid.

The Court of Civil Appeals held that the plaintiffs did not have title to the water taken by them as against the defendants by limitation. With that conclusion we are inclined to agree, but for a very different reason to that assigned by that court. The record shows the ditch and dam were constructed and water taken under license or with consent, hence the issue of limitation was not in the case. 27 Ruling Case Law, p. 1293, Sec. 204, p. 1125, Sec. 53; Kinney on Irrigation, Vol. 2, Secs. 985, 1050. As we understand the opinion of the Court of Civil Appeals, it holds that because the defendants during the thirty-five years the dam had been maintained and water taken had never had occasion to use water for irrigation, there was no limitation in the case. We will examine the facts and see if this is a sound doctrine.

The facts are that the predecessors in title of the plaintiffs went upon the lands of the predecessors in title of the defendants and constructed a dam in Spring Creek, adjoining defendants, appropriated their lands, and flowed their banks for either the full width of the lands or at least 8,000 feet, causing the water to rise higher than it would have otherwise been; placed a large lake of water along the boundary of the lands for this distance; occupied the defendant's lands for the construction of the ditch; operated a headgate on their lands; and constructed a ditch of sizeable dimensions on and across defendant's lands, sufficient to constitute a pitfall for stock and an inconvenience in passing, amounting even to something more substantial than a right of way through the defendants' pasture. They maintained this ditch and dam and diverted water thereby for thirty-five years. The point of diversion was not above nor below defendants' lands, but on them, and the water which was taken was water riparian to defendants' lands. The act of the

plaintiffs and their predecessors in building the dam and ditch, and taking the water must be regarded as one act, and is to be considered as a whole, and its maintenance for thirty-five years, if without consent, a continuing trespass. Moreover, when Fowlkes sold the "Twin Mountain Farm" to Charles Motl, he sold him "also the dam and irrigating ditch which supplies said lands with water for irrigating, the same being known as the Twin Mountain Farm, dam and ditch, and all water rights and privileges secured by said dam and ditch. * * * The entire right to said dam and ditch and the water supply of same is hereby conveyed to said Motl." We assume the deed was placed of record, but whether so or not, the occupancy of the defendants' lands by the dam and ditch, and the diversion of the water, was open, plain and notorious, and sufficient to put all upon inquiry as to the title and right of the Motl heirs to maintain the same and take water thereby, and generally of the authority by which it was constructed and maintained. Markley v. Christen, 226 S. W., 150; 27 Ruling Case Law, p. 1290, Sec. 201.

On this state of facts, in the absence of consent, the defendants would have been barred by limitation. Farnham on Waters, Vol. 2, Secs. 540, 531, 532; 15 Ruling Case Law, p. 455, Sec. 13; 27 Ruling Case Law, p. 1103, Sec. 38; p. 1125, Sec. 53; p. 1284, Sec. 195; p. 1291, Sec. 203; p. 1293, Sec. 205; p. 1133, Sec. 63; Sec. 65; Kinney on Irrigation, Vol. 1, Arts. 1039, 1040, 1045.

We have said the foregoing in order to indicate the diversions of our views of the case from those of the Court of Civil Appeals on the subject of limitation. However, as previously said, we think this subject is eliminated from the case because of consent or license.

In 1886 Nasworthy, who owned the land now owned by the plaintiffs, contracted to sell the same to Lackey as soon as Lackey should procure irrigation for the place and put it in cultivation. Lackey and Nasworthy then jointly approached Lee, who owned the land now owned by the defendants, and requested his permission to erect the dam and ditch for the diversion of the water, and Lee verbally consented thereto. Nothing was said at the time about any limitation on the water rights of Lee, and Lee never objected during the time he was owner of the land to the existence of the dam or ditch or to the use of the water out of the reservoir formed by the dam. No consideration was paid Lee for this consent, and none required by him. No compensation was paid, and none subsequently paid, to the owners of the land now owned by the defendants. As a result, however, of the consent of Lee, the

dam and ditch and headgate were constructed and the water taken therefrom for thirty-five years. The dam was a very substantial structure, and when rebuilt, costing some $1,500 or more. In addition to this, Lackey put the "Twin Mountain Farm" in cultivation, and paid a large sum of money therefor— subsequently selling it to Motl, who paid an additional amount, far above the price for non-irrigated land in that section. Because no consideration was paid or demanded by Lee, it does not follow that there was not ample consideration to support the grant, license, or easement—by whatever name it may be known. Lee obtained by his agreement a lake of water with an eight-foot head, 425 feet wide, and some 8,400 feet long, covering about 105 acres, with a holding capacity of approximately 650 acre-feet of water, whereas before he had only a stream subject to the fluctuations of the commonly known droughts which occur with some frequency in the semi-arid portions of the State, with only a hole or natural reservoir as his water supply during such periods of time. That the reservoir of water made by the construction to which we have referred was of great value and use, and made the land a great deal more valuable for grazing and stock raising purposes, there can be no doubt. The record does not show what motives actuated Lee. It all occurred more than thirty years ago, and the facts if provable are clouded by the mists of age and memory. But we would be shutting our eyes to what everyone else knows if we were to fail to conclude that the lake was of value to Lee, and a sufficient consideration to support the grant, license or easement orally given by him. Farnham on Waters, Vol. 3, Sec. 791.

But, whether we are correct or not in concluding there was a sufficient consideration moving to Lee, we think, under the facts of the case, Lee and his successors in title are estopped to revoke the license and deny the right of the plaintiffs to maintain their dam and ditch where located, and take their own appropriated waters and defendants' riparian waters, as has been done for thirty-five years. Markley v. Christen, 226 S. W., 150, 153; Thomas v. Junction City Irr. Co., 80 Texas, 550, 553, 16 S. W., 324; Chicago, R. I. & G. R. Co. v. Johnson, 156 S. W., 253, 256; T. & St. L. R. R. Co. v. Jarrell, 60 Texas, 267; Toyaho Creek Irr. Co. v. Hutchins, 21 Texas Civ. App., 274, 52 S. W., 101, 105; Weil on Water Rights, Vol. 1, Sec. 556; Farnham on Waters, Vol. 3, Secs. 787, 788; 27 Ruling Case Law, p. 1135, Sec. 66; 17 Ruling Case Law, p. 585, Sec. 95.

In this conclusion we desire to be distinctly understood as

holding that the defendants as riparians would be entitled to the prior use of the riparian waters of Spring Creek as we here defined them, but for the fact that their predecessor in title had in effect conveyed their riparian waters to those under whom plaintiffs hold; and their prior right to use the waters of Spring Creek up to the highest line of ordinary flow, as against the defendants, is denied them, not because such a right does not exist, but because defendants are estopped to assert it in this case.

In view of the conclusions stated in this opinion, it follows that the judgment of the Court of Civil Appeals must be reversed, and that of the District Court affirmed, and it is so ordered.